**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| Axion International, Inc., *et al.*,[1] | Case No.: 15-12415 (CSS) |
| Debtors. | (Joint Administration Requested) |

**MOTION OF DEBTORS FOR (I) AUTHORIZATION TO (A) OBTAIN
SECURED DIP FACILITY PURSUANT TO 11 U.S.C. §§ 361, 362, AND 364(C)
AND (D), (B) GRANT SECURITY INTERESTS, SUPERPRIORITY CLAIMS
AND ADEQUATE PROTECTION AND (C) AND USE CASH COLLATERAL;
AND (II) SCHEDULE A FINAL HEARING PURSUANT
<ins>TO BANKRUPTCY RULE 4001(C)</ins>**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") hereby move the Court (the "Motion") for entry of interim (the "Interim Order") and final orders (the "Final Order," and together with the Interim Order, the "DIP Orders") pursuant to sections 361, 362, 364(c) and 364(d) of title 11 of the United States Code §§ 101-1532 (the "Bankruptcy Code"), Rules 2002, 4001(c) and (d) and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 4001-2, 4001-3, 9013-1(f) and (g) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") for entry of the Interim Order, substantially in the form attached as Exhibit "A," and the Final Order:

    (i) authorizing the Debtors to enter into a financing arrangement (the "DIP Facility") on an interim basis on the terms set forth in the term sheet attached as Exhibit B (the "DIP Term Sheet") among the Debtors, as borrowers, and Plastic Ties Financing LLC, as lender (in

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Axion International, Inc. [1880], Axion International Holdings, Inc. [6389], Axion Recycled Plastics Incorporated [5048]. The address of the Debtors' corporate headquarters is 4005 All American Way, Zanesville, OH 43701.

such capacity, the "<u>DIP Lender</u>") and on a final basis pursuant to the terms and conditions substantially similar to those set forth in the DIP Term Sheet (the documentation evidencing the DIP Facility including the Interim DIP Order and the Final DIP Order, are hereinafter referred to as "<u>DIP Loan Documents</u>");[2]

(ii)   granting the DIP Lender, pursuant to section 364(c) and 364(d) of the Bankruptcy Code, priming liens, priority liens, and superpriority claims, as hereinafter set forth on the Kronstadt Collateral (defined below) (and any other assets of the Debtors other than the Ohio State Collateral and Community Bank Collateral) and second-priority liens on the Ohio State Collateral and Community Bank Collateral;

(iii)  granting adequate protection to prepetition lien holder Allen Kronstadt ("<u>Kronstadt</u>");

(iv)   authorizing the Debtors to use cash collateral within the meaning of section 363(a) of the Bankruptcy Code (the "<u>Cash Collateral</u>"), pursuant to section 363(c) of the Bankruptcy Code and to provide adequate protection, pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code;

(v)    scheduling a preliminary hearing (the "<u>Preliminary Hearing</u>") on the Motion to consider entry of an Interim Order pursuant to Bankruptcy Rule 4001 authorizing the Debtors to borrow under the DIP Facility the amounts set forth in and upon the terms and conditions set forth in the Interim Order pending the Final Hearing referred to below; and

(vi)   scheduling a final hearing (the "<u>Final Hearing</u>") to consider entry of the Final Order authorizing on a final basis, *inter alia*, the DIP Facility.

In support of this Motion, the Debtors respectfully represent as follows:

---

[2]      Pursuant to the DIP Term Sheet, the DIP Lender can rely on the DIP Term Sheet, the Interim Order and the Final Order in its sole discretion or request that the Debtors execute and deliver any such additional Loan Documents as the DIP Lender may reasonably request from time to time.

## BANKRUPTCY RULE 4001 CONCISE STATEMENT

1.      As required by Bankruptcy Rule 4001(c) and Local Bankruptcy Rule 4001-2, essential terms of the proposed DIP Facility, DIP Loan Documents and the DIP Orders are as follows:[3]

(a)      <u>Maximum Borrowing Available on a Final Basis</u>:   $2,200,000 through January 19, 2016. (DIP Term Sheet at p. 1).

(b)      <u>Interim Borrowing Limit</u>:  $850,000. (DIP Term Sheet at pp.1-2)

(c)      <u>Interest Rate</u>:  twelve percent (12%) per annum (DIP Term Sheet at p.3)

(d)      <u>Default Interest Rate</u>:  two (2%) in excess of applicable interest rate (DIP Term Sheet at p. 3)

(e)      <u>Maturity</u>:

(i)      January 19, 2016;

(ii)      the substantial consummation (as defined in Bankruptcy Code § 1101 and which for purposes hereof shall be no later than the effective date) of a confirmed plan of reorganization;

(iii)      conversion of any of these cases to a case under chapter 7 of the Bankruptcy Code;

(iv)      appointment of a trustee for the Debtors;

(v)      dismissal of any of these cases;

(vi)      December 23, 2015 if the Final Order  has not been entered;

(vii)      the date on which the Court enters a final order approving a post-petition financing between the Debtors and another lender(s) or investor(s) (as the case may be) (other than the DIP Lender);

(viii)      consummation of a sale of substantially all of the Debtors' assets under Bankruptcy Code § 363;

---

[3] This summary is qualified in all respects by the terms of the DIP Orders and the DIP Term Sheet (as applicable).

    (ix)    the date on which the Court enters an order approving a sale of any of the Debtors' assets under Bankruptcy Code § 363 to any party other than Kronstadt or his designee; and

    (x)    five (5) business days after the DIP Lender notifies the Debtors and their counsel in writing of an Event of Default which is not subsequently cured or waived by the end of such notice period.

(DIP Term Sheet at p. 4-5).

(f)    <u>Bankruptcy Rule 4001(c)(l)(B)(i):  Grant of Priority or Lien on Property of Estate Under Section 364(c) or (d)</u>.  The DIP Loan Documents and the DIP Orders grant the DIP Lender a Superpriority Claim and first-priority DIP Liens on the Kronstadt Collateral (defined below) (and any other assets of the Debtors other than the Ohio State Collateral and Community Bank Collateral) and second-priority liens on the Ohio State Collateral and Community Bank Collateral.  The Superpriority Claim in favor of the DIP Lender shall be senior to all claims except for the Carve-Out.[4]  The DIP Liens also shall be senior to Kronstadt's Replacement Liens.  (DIP Term Sheet at pp. 5-6; Interim DIP Order at ¶¶ 15(d); 22(a)).

(g)    <u>Bankruptcy Rule 4001(c)(l)(B)(ii):  Adequate Protection or Priority for Prepetition Claims</u>.  The Debtors will provide adequate protection to Kronstadt to the extent those liens are being primed by the DIP Liens under section 364(d) of the Bankruptcy Code (DIP Term Sheet at p. 5; Interim Order at ¶ 10(ii)).

(h)    <u>Bankruptcy Rule 4001(c)(l)(B)(iii):  Determination of Validity, Enforceability, and Priority of Prepetition Lien</u>.  The DIP Orders provide that Kronstadt has prepetition liens that are valid and enforceable against the estates.  It also provides that his prepetition liens are subordinate to the DIP Liens.  (DIP Term Sheet at p. 5; Interim Order at ¶ 22(a)).

(i)    <u>Bankruptcy Rule 4001(c)(l)(B)(iv):  Waiver of Automatic Stay</u>.  The DIP Orders provide that the Debtors will waive the protections of the automatic stay to permit the DIP Lender to exercise all rights and remedies under the DIP Documents (defined below) and to grant the DIP Lender the liens and security interests contemplated by the DIP Documents.  (DIP Term Sheet at p. 13; Interim Order at ¶ 33(a)).

(j)    <u>Bankruptcy Rule 4001(c)(l)(B)(v):  Waiver of Right to File Plan, Seek Extension of Time to File Plan, Request Use of Cash Collateral or Request Authority to Obtain Credit under Section 364 of the Bankruptcy Code</u>. None.

---

[4] Capitalized terms used but not defined in this Motion shall have the meanings given such terms in the DIP Term Sheet.

(k)     Bankruptcy Rule 4001(c)(l)(B)(vi):  Deadlines for Filing Plan, Approval of Disclosure Statement, Plan Confirmation.  None.

(l)     Bankruptcy Rule 4001(c)(l)(B)(vii):  Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to Prepetition Lien or Foreclosure.  None.

(m)     Bankruptcy Rule 4001(c)(l)(B)(viii):  Release, Waiver or Limitation on Claim or Cause of Action by the Debtors.  The terms of the DIP Facility include the following waivers and releases by the Debtors:

(i)     The Debtors waive the right to discharge the DIP Obligations under section 1141(d) of the Bankruptcy Code (Interim Order at ¶ 37);

(ii)     The Debtors release and agree jointly and severally to indemnify the DIP Lender against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and expenses of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of, or in connection with the preparation for a defense of, any investigation, litigation or proceeding arising out of, related to or in connection with the the DIP Loan, the transactions contemplated thereby, and any use made or proposed to be made with the proceeds thereof (DIP Term Sheet at p.6);

2.     The Final Order contains the following waivers and releases by the

Debtors:

(i)     The Debtors irrevocably waive any right to challenge or contest Kronstadt's liens on the Kronstadt Collateral or the validity of the prepetition obligations or prepetition debt documents (Interim Order at ¶ 10);

(ii)     The Debtors waive any rights under section 1141(d) of the Bankruptcy Code to discharge any DIP Obligations (Interim Order at ¶ 37); and

(iii)     Subject to the entry of the Final DIP Order, the Debtors waive rights under section 506(c) of the Bankruptcy Code (Interim Order at ¶ 28).

(n)     Bankruptcy Rule 4001(c)(l)(B)(ix):  Indemnification of Any Entity.  As previously noted (see ¶ 1(m)(ii) above)), the Debtors release and agree jointly and severally to indemnify the DIP Lender against any and all

claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and expenses of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of, or in connection with the preparation for a defense of, any investigation, litigation or proceeding arising out of, related to or in connection with the DIP Loan, the transactions contemplated thereby, and any use made or proposed to be made with the proceeds thereof (DIP Term Sheet at p.6).

(o)    Bankruptcy Rule 4001(c)(l)(B)(x):  Release, Waiver or Limitation on 506(c) Rights.  As previously noted (see ¶ 2(iii) above), the Debtors waive rights under section 506(c) of the Bankruptcy Code (Interim Order at ¶ 28).  Pursuant to Local Bankruptcy Rule 4001-2(a)(i)(C), including this waiver in the DIP Orders is justified under the circumstances because the DIP Lender would not provide the DIP Facility and fund these estates without it.  Accordingly, including this provision in the DIP Orders provides a substantial benefit to the estates.

(p)    Bankruptcy Rule 4001(c)(l)(B)(xi):  Lien on Actions Under Sections 544, 545, 547, 548, 549, 553(b), 723(a), or 724(a).  The DIP Orders do not provide for liens on the Debtors' causes of action and recoveries pursuant to chapter 5 of the Bankruptcy Code, or any other avoidance actions of any Debtor under the Bankruptcy Code (collectively, "Avoidance Actions") (Interim Order at ¶ 15(a)).

3.    Use of Cash Collateral.  As required by Bankruptcy Rule 4001(b) and Local Bankruptcy Rule 4001-2, the details of the DIP Orders relating to use of Cash Collateral are set forth below.[5]  For purposes of this Motion and the DIP Orders, the term "Cash Collateral" includes, without limitation, (a) all "cash collateral" as defined under section 363 of the Bankruptcy Code and (b) all deposits subject to setoff and cash arising from the collection or other conversion to cash of property of the Debtors in which the Kronstadt asserts security interests, liens or mortgages, regardless of (a) whether such security interests, liens, or mortgages existed as of the commencement of these cases or

---

[5] This summary is qualified in all respects by the terms of the DIP Orders.

arose thereafter, and (b) whether the property converted to cash existed as of the commencement of these cases or arose thereafter.

(a)  <u>Bankruptcy Rule 4001(c)(l)(B)(i):  Name of Each Entity with Interest in the Cash Collateral</u>.  Kronstadt.

(b)  <u>Bankruptcy Rule 4001(c)(l)(B)(ii):  Use of the Cash Collateral</u>.  The Debtors will use Cash Collateral specifically in accordance with the Approved Budget (defined below and attached as Exhibit C) and generally to:  (i) continue operating their businesses while in chapter 11, including overhead and all other expenses arising in the ordinary course of the Debtors' businesses; and (ii) fund the professional and other fees (including fees payable to the Office of the United States Trustee) associated with administering and protecting these chapter 11 cases and conducting an auction under section 363 of the Bankruptcy Code for the Sale, negotiating and closing the Sale, and, following the consummation of the Sale, winding down and closing the estates, in each case in accordance with the Approved Budget, as it may be updated from time to time.

(c)  <u>Bankruptcy Rule 4001(c)(l)(B)(iii) and (iv):  Other Material Terms and Adequate Protection</u>.  If approved by this Court:

(i)  <u>Amount</u>.  The Debtors will be authorized to use Cash Collateral in accordance with the Approved Budget until the earliest to occur of: (i) January 19, 2016; (ii) the substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the effective date) of a confirmed plan of reorganization; (iii) conversion of these cases to a case under chapter 7 of the Bankruptcy Code; (iv) appointment of a trustee for the Debtors; (v) dismissal of any of the Debtors' bankruptcy cases; (vi) December 23, 2015, if the Final Order (for the DIP loan facility) has not been entered; (vii) the date on which the Court enters a final order approving a postpetition financing between the Debtors and another lender(s) or investor(s) (as the case may be) (other than the DIP Lender); (viii) consummation of a sale of substantially all of the Debtors' assets under section 363 of the Bankruptcy Code; (ix) the date on which the Court enters an order approving a sale of any of the Debtors' assets under section 363 of the Bankruptcy Code to any party other than Kronstadt; and (x) five business days after the DIP Lender notifies the Debtors and their counsel in writing of an Event of Default which is not subsequently cured or waived by the end of such notice period; <u>provided</u>, <u>however</u>, that if the Court has entered an order approving the Lender Sponsored Transaction and all conditions to the closing of that transaction have been satisfied, then the Due Date shall be

extended for up to fifteen days pursuant to the Approved Budget. The DIP Lender may further extend the Due Date in its sole discretion.

(ii)    <u>Events of Default</u>.  A "<u>Cash Collateral Event of Default</u>" shall occur with respect to the Debtors' use of Cash Collateral if:

    (a)    the Debtors fail to perform any of their obligations in accordance with the terms of the DIP Orders, including, without limitation, the Debtors' failure to use Cash Collateral in compliance with the Approved Budget or failure to provide the information or access required in Paragraphs 23 of the Interim DIP Order;

    (b)    any representation or warranty made by the Debtors under the DIP Orders or any pleading, certificate, report or financial statement delivered to Kronstadt proves to have been false or misleading in any material respect as of the time made or given (including by omission of material information or fact necessary to make such representation, warranty or statement not misleading);

    (c)    the appointment of a chapter 11 trustee or examiner with expanded powers;

    (d)    the chapter 11 cases are converted to cases under chapter 7;

    (e)    without the prior written consent of Kronstadt or the DIP Lender, the Debtors shall purport to grant or file a motion seeking to grant a third party a security interest or lien on all or part of any property of the Debtors that has a priority which is senior to, or equal with, any of Kronstadt's liens on the Kronstadt Collateral or Replacement Liens granted under the DIP Orders in all or any of a portion of such property (other than the DIP Liens); or

    (f)    an Event of Default under the DIP Facility shall have occurred.

(iii)    <u>Shortening Challenge Period</u>.  The challenge period is shortened to coincide with the anticipated Sale of the Debtors' assets to Kronstadt (or his designee) via credit bid.  The Debtors intend to have the Sale heard on or before January 19, 2016.

(iv)    <u>Adequate Protection to the Kronstadt; Replacement Liens</u>.  As security for payment of any claim of Kronstadt for any diminution in value of the Kronstadt Collateral (an "<u>Adequate Protection Claim</u>"), the Debtors have agreed to grant Replacement Liens to

Kronstadt on all of the Debtors' now owned or after-acquired real and personal property, assets and rights, of any kind or nature, wherever located, and the proceeds, products, rents and profits thereof. Kronstadt's Replacement Liens shall be subordinate in priority and right to the DIP Liens.

(v) <u>Superpriority Claim</u>. Kronstadt will be granted Superpriority Claims as provided for in section 507(b) of the Bankruptcy Code; the Superpriority Claims granted to Kronstadt shall be subordinate in priority and right to the Superpriority Claims granted to the DIP Lender.

(vi) <u>Priority of Claims Among Kronstadt and the DIP Lender</u>. The Replacement Liens granted to Kronstadt shall be subordinate in priority and right to the Replacement Liens granted to the DIP Lender.

(vii) <u>Payment of Fees and Expenses</u>. None, other than payment of the DIP Lender's fees and expenses to reimburse the DIP Lender for all of the costs and expenses of the DIP Lender in connection with the preparation, negotiation, execution and delivery of the DIP Loan Documents and the DIP Facility, any amendment or waiver to the DIP Loan Documents or the DIP Facility, the collection or other enforcement of the DIP Loan Documents or the DIP Facility, the perfection and priority of any liens, and the preservation of any and all rights of the DIP Lender under the DIP Loan Documents and under the DIP Facility, including, without limitation, all fees and expenses of all counsels to the DIP Lender in connection with any of the foregoing.

(viii) <u>Modification of the Automatic Stay</u>. The automatic stay under section 362(a) of the Bankruptcy Code is modified by the DIP Orders as necessary to effectuate all of the terms and provisions of the DIP Orders, including without limitation, to: (a) permit the Debtors to grant the adequate protection provided for in the DIP Orders; (b) permit the Debtors to perform such acts as Kronstadt and the DIP Lender may request to assure the perfection and priority of the liens granted in the DIP Orders; and (c) permit the Debtors to incur all liabilities and obligations to Kronstadt and the DIP Lender under the DIP Order. (Interim Order at ¶ 33(a)).

**<u>Status of the Case and Jurisdiction</u>**

4. On the date hereof (the "<u>Petition Date</u>"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

5.      On the Petition Date, the Debtors also filed motions or applications seeking certain typical "first day" orders.  The factual background regarding the Debtors, including their current and historical business operations and the events precipitating these chapter 11 filings, is set forth in detail in the Declaration of Donald W. Fallon in Support of Chapter 11 Petitions and First Day Motions (the "<u>Fallon Declaration</u>"), filed concurrently herewith and fully incorporated herein by reference.

6.      The Debtors have continued in possession of their properties and are operating and managing their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.      No request has been made for the appointment of a trustee or examiner, and a creditors' committee has not yet been appointed in these Cases.

8.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is core within the meaning of 28 U.S.C. § 157(b)(2).

9.      The statutory and legal predicates for the relief sought herein are sections 361, 363(c), 364(c) and 364(d) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001(c) and (d) and 9014 and Local Rules 4001-2, 4001-3, 9013-1(f) and (g).

### Debtors' Business Operations

10.      Axion International Holdings, Inc. ("<u>Holdings</u>") is a publicly-traded company (AXIH), organized under Colorado law, with executive offices located in Zanesville, Ohio.   Axion International, Inc. ("<u>Axion International</u>"), a Delaware corporation, is a wholly-owned subsidiary of Holdings, and Axion Recycled Plastics Incorporated ("<u>Axion Recycling</u>"), an Ohio corporation, is a wholly-owned subsidiary of Axion International.  The Debtors' manufacturing facilities (both of which are leased) are

located in Zanesville, Ohio and Waco, Texas. The Debtors employ approximately 70 individuals.

11.     The Debtors manufacture, market and sell structural products and building materials, with an emphasis on railroad ties and construction mats. Using patented technology and proprietary know-how, the Debtors transform post-consumer and post-industrial recycled plastics, such as high-density polyethylene and glass-filled polypropylene, into products that are ideal replacements for similar products made from traditional materials such as wood, steel or concrete. Compared to traditional materials, the Debtors' products are cost competitive, and feature longer life cycles and lower maintenance costs.

12.     The Debtors' strategic focus has been to (i) expand manufacturing capacity to meet current demand for their railroad ties and construction and temporary road mats; (ii) further penetrate chosen end-use markets in the railroad, transportation, and oil and gas industries; (iii) identify new applications for the Debtors' proprietary technologies based on market research and geographic segmentation; and (iv) spread exposure to risk and liability through product stratification.

13.     The Debtors have been plagued by a lack of liquidity requiring a reduction in production capacity. The Debtors' principal costs and expenses include raw materials and expenses associated with production and manufacturing. To compensate for the liquidity challenges, the Debtors were forced to reprocess slow-moving and obsolete products into new products and to liquidate inventory at lower sales prices in order to induce customers to purchase and/or accept shorter payment terms.

14.    The actions taken by the Debtors to decrease production activity, liquidate available inventory and to seek additional capital investment from both public and private sources have proved largely unsuccessful.  Through funds made available prior to the Petition Date and the proposed DIP Facility, the Debtors are purchasing raw materials and rebuilding relationships with vendors who are necessary to the production side of the Debtors' business.

**Prepetition Capital Structure**

15.    On November 15, 2013, Axion Recycled Plastics, entered into an asset purchase agreement (the "2013 Purchase Agreement").  Pursuant to the terms of the 2013 Purchase Agreement, Axion Recycling acquired certain assets relating to the operation of a recycled plastics facility located in Zanesville, Ohio.   As a component of the consideration paid by Axion Recycling for these assets, Axion assumed a 3% promissory note payable to the State of Ohio with a remaining principal balance of $236,201 as of June 30, 2015 (the "Ohio State Note" and the "Ohio State Secured Debt").  The Ohio State Note is secured by first-priority liens encumbering certain equipment owned by Axion Recycling (the "Ohio State Collateral").

16.    In 2013, the Debtors entered into two term loans with The Community Bank in the aggregate principal amounts of $1,000,000 and $3,500,000 (the "Community Bank Debt").  The Community Bank Debt bears interest at 4.25% per annum, is secured by first-priority liens encumbering certain identifiable equipment owned by the Debtors (the "Community Bank Collateral"), and matures on November 15, 2018.

17.    Over the course of the last several years, Kronstadt loaned substantial sums of money to the Debtors (for operational and other needs), sometimes on an

unsecured basis and others on a secured basis.  As of the Petition Date, the total principal sum owed to Kronstadt pursuant to secured promissory notes is approximately $5.2 million (the notes are referred to as the "Kronstadt Secured Notes" and the debt owed pursuant thereto, is referred to as the "Kronstadt Secured Indebtedness").  The Ohio State Note, the Community Bank Debt and the Kronstadt Secured Notes are hereinafter referred to as the "Prepetition Obligations."  The Kronstadt Secured Notes are secured by (a) second-priority perfected security interests in the Ohio State Collateral and the Community Bank Collateral, and (b) a first-priority perfected security interest in all of the other assets of the Debtors (the "Kronstadt Collateral," and together with the Ohio State Collateral and the Community Bank Collateral, the "Kronstadt Collateral").  The Ohio State Secured Debt, the Community Bank Debt and the Kronstadt Secured Indebtedness are hereinafter referred to as the "Prepetition Secured Debt."

18.    During 2014, the Debtors borrowed $4,000,000 from EagleBank pursuant to the terms of a promissory note and loan agreement (the "EagleBank Debt").  Interest accrues on the outstanding principal of the EagleBank Debt at a fixed interest rate of 5% per annum and is payable monthly.  All outstanding principal and accrued but unpaid interest is due on September 18, 2017.  The EagleBank Debt is not secured by any of the Debtors' assets, but is one-third guaranteed by Kronstadt.

**Events Leading to Bankruptcy**

19.    As noted above, the Debtors are facing a liquidity crisis requiring a curtailment of production, and are therefore inability to meet customer demand.  In addition to a cash flow crisis, as of September 30, 2015, the Debtors had a working capital deficit of $10,100,000, a stockholders' deficit of $31,500,000 and accumulated

losses of $86,200,000.   Further details of the Debtors' financial performance can be found in the Debtors' most recently filed Form 10Q (Quarterly Report pursuant to Section 14 or 15(d) of the Securities Exchange Act of 1934) for the quarterly period ended September 30, 2015, filed on or about November 16, 2015.

20.     The Debtors' access to capital has always been extremely limited.   Since September 2012, the Debtors have relied upon the continued financial contributions from a concentrated group of investors (including Kronstadt) who owned a substantial portion of the Debtors' debt and equity securities.   In March 2015, all but one member of this group (i.e. Kronstadt) indicated, in light of the Debtors' continued financial position, that they were unwilling to invest further.

21.     The Debtors engaged in substantive discussions with strategic and financial advisors, including several investment banks, to raise outside capital.   These discussions have not proven successful.   While the Debtors have been able to negotiate certain modifications to the terms of certain equity and debt securities issued by the Debtors, the Debtors' financial position remains dire.

22.     The DIP Lender has agreed to terms on which it will provide the Debtors with postpetition financing in the form of the DIP Facility.   The DIP Facility will provide the Debtors with liquidity as they pursue a sale of their assets under section 363 of the Bankruptcy Code.

**RELIEF REQUESTED**

23.     The Debtors respectfully request the following relief from this Court:

    a.     authorization and approval for the Debtors to obtain postpetition financing up to the aggregate principal amount of $2,200,000 on the terms and conditions set forth in the DIP Loan Documents, and any security agreements, control agreements, pledge agreements or

other similar documents contemplated thereby (collectively with the DIP Loan Documents, the "DIP Documents"), among the Debtors, as borrowers, and the DIP Lender;

b.   authorization for the Debtors to execute and enter into the DIP Documents and to perform such other and further acts as may be required in connection with the DIP Documents;

c.   authorization pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code to grant senior first-priority liens (as more fully described in the DIP Documents, the "DIP Liens") to the DIP Lender on the Kronstadt Collateral (and any other assets of the Debtors other than the Ohio State Collateral and Community Bank Collateral) and second-priority liens on the Ohio State Collateral and Community Bank Collateral;

d.   authorization pursuant to section 364(c)(1) of the Bankruptcy Code to grant Superpriority Claims to the DIP Lender with priority over all administrative expenses, other than the Carve-Out;

e.   authorization for the Debtors to use Cash Collateral in which Kronstadt has an interest;

f.   authorization to grant adequate protection, including, among other things, Replacement Liens and Superpriority Claims, to Kronstadt, whose liens and security interests are being primed by the DIP Lender pursuant to section 364(d) of the Bankruptcy Code in connection with the DIP Facility and pursuant to the DIP Documents; and

g.   authorization subject to, and only effective upon the entry of, the Final Order granting such relief, to limit the Debtors' right to surcharge against collateral pursuant to section 506(c) of the Bankruptcy Code.

## BASIS FOR RELIEF REQUESTED

### A.   The Debtors' Need for Liquidity

24.   The Debtors need to access the DIP Facility and use collateral, including Cash Collateral, to continue production operations and conduct a sale of their assets. The Debtors' use of the collateral (including Cash Collateral) is necessary to ensure that the Debtors have sufficient working capital and liquidity to preserve and maintain the going

concern value of the Debtors' estates, which in turn is integral to maximizing recoveries for the Debtors' stakeholders.

25.    To maintain production operations and ultimately restore confidence with those entities with whom the Debtors have done business, the Debtors need access to additional financing in the form of the DIP Facility.  The financing will enable the Debtors to purchase raw materials, stabilize operations, and begin restoring critical relationships.

**B.    The Debtors' Decision to Enter into the DIP Loan Documents**

26.    Over the past eight to nine months, the Debtors have not been able to obtain sufficient equity or debt financing to maintain production activity or expand manufacturing capacity to meet current demand for their railroad ties and construction and temporary road mats.  Additionally, the Debtors have curtailed production which has led to recent inefficient manufacturing processes that have resulted in increased costs producing a further drain on the Debtors' cash flow.  The Debtors' efforts to secure financing were hindered by concerns raised by the Debtors' disclosures regarding the Debtors' ability to continue as a going concern contained in its financial statements.

27.    The Debtors could not obtain any unsecured financing, nor could the Debtors and their advisors locate an entity willing to extend credit in exchange for a loan that would provide sufficient liquidity and would be subordinate to the prepetition liens of Kronstadt.  Nor could the Debtors obtain an additional equity investment from any potential strategic partner, despite having engaged in an aggressive marketing campaign over the last several years to solicit investments in, or the purchase of, the Debtors.

28.     Faced with this situation, the Debtors decided to enter into the DIP Loan Documents, and conducted arms' length and good faith negotiations with the DIP Lender. The Debtors ultimately determined that the DIP Lender's proposal for postpetition financing was the most favorable under the circumstances, and adequately addressed the Debtors' reasonably foreseeable liquidity needs.

29.     In making their decision to seek financing from the DIP Lender, the Debtors considered many factors. *First*, the DIP Lender's manager, Kronstadt, holds secured priority liens on substantially all of the Debtors' assets, which liens the Debtors believe are valid. *Second*, the DIP Lender's existing knowledge of the Debtors' business and the collateral provide significant benefits, including the speed with which the DIP Lender is able to close. *Third*, the Debtors did not believe that any lender would be willing to lend money to the Debtors on similar or less favorable terms to those contained in the DIP Loan Documents given the Debtors' inability to obtain alternative postpetition financing proposals from other lenders through (a) credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, (b) unsecured credit allowable under Bankruptcy Code sections 364(a) and 364(b), or (c) credit secured by liens on the Debtors' assets junior to the liens of Kronstadt, as contemplated by section 364(c)(3) of the Bankruptcy Code.

30.     In the exercise of their sound business judgment, the Debtors believe that the proposal for the DIP Facility provided by the DIP Lender is the most favorable under the circumstances and addresses the Debtors' working capital needs during the pendency of the Debtors' chapter 11 cases.

31.    The DIP Facility will give the Debtors valuable additional time to pursue a sale of their assets while maintaining the going concern value of the Debtors' businesses. Thus, the Debtors determined that entry into the DIP Loan Documents was in the best interests of their estates, creditors and other parties in interest.

### C.    Provisions To Be Highlighted Pursuant to Local Rule 4001-2

32.    The Debtors believe the following provisions of the Interim Order must be highlighted pursuant to Local Rule 4001-2:

a.    Binding the Estate to Validity, Perfection, or Amount of Secured Creditor's Prepetition Lien.  Interim Order ¶ 38.

b.    Waiver of Rights of Estate Under Section 506(c) as to the Final DIP Order.  Interim Order at ¶ 28 (preserving right to request a waiver of the provisions of section 506(c) of the Bankruptcy Code at Final DIP Hearing).

33.    The provisions of the Interim Order were negotiated at arm's length and in good faith.  The Interim Order enables the Debtors to obtain the financing necessary to maintain their operations and preserve and maximize the value of their estates.

### D.    Liens to Secure the DIP Indebtedness

34.    As security for the DP Lender's commitment, the DIP Lender shall be granted the following perfected first priority lien (the "DIP Facility Liens") on any and all current and future assets of the Debtors of any nature or type whatsoever, including, without limitation, cash, accounts, accounts receivable, goods, instruments, investment property (including, without limitation, ownership interests in corporations, partnerships and limited liability companies), inventory, vehicles, customer lists, trademarks, copyrights, brands, know-how and other intellectual property, minerals, mineral rights, plant and equipment, patents, trade secrets, tax assets, real property and/or leasehold rights, personal property, any causes of action under the Bankruptcy Code or applicable

non-bankruptcy law, excluding causes of action and recoveries pursuant to Chapter 5 of the Bankruptcy Code, all other tangible and intangible assets, and any and all proceeds of the foregoing; and (ii) constructive control over the Debtors' bank accounts in similar form and substance of lockbox and/or control accounts customary for transactions of this nature exercisable upon an Event of Default and stay relief from the Court, or as may be provided in the Interim Order and Final Order, except that duly perfected real property tax liens, if any, shall not be primed (all of the foregoing, the "DIP Facility Collateral"), subject only to, in the event of the termination of the DIP Facility, the payment of the Carve-Out (as defined in paragraph 29).

## F.     Carve-Out

35.     The DIP Facility Liens and the Superpriority Claims are subordinate only to the following (the "Carve-Out"):   (a) allowed reasonable fees and expenses of attorneys and financial advisors (collectively, the "Professionals") employed by the Debtors and the Committee and any disbursements of any member of the Committee incurred or accrued before the termination of the DIP Facility or the Debtors' use of Cash Collateral hereunder, up to the amounts set forth in the Approved Budget, (b) following notice of the termination of the DIP Facility or Debtors' use of Cash Collateral, the payment of allowed professional fees and disbursements incurred or accrued after such notice of termination by the Professionals and any disbursements of any member of the Committee in an aggregate amount not to exceed $50,000 (which is in addition to compensation previously awarded or incurred prior to termination of the Debtors' use of Cash Collateral, but subject to Court approval), (c) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy

Court, and (d) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $25,000.

36.     Further, the Carve-Out shall not include professional fees and disbursements incurred in connection with the commencement and prosecution of any adversary proceeding or contested matter in which any person or entity asserts any claims or causes of action against any or all of the DIP Lender or Kronstadt or challenges or raises any defense to the DIP Liens, DIP Lender, Kronstadt Secured Indebtedness, the Kronstadt Liens, the Replacement Liens or the Superpriority Claims.  Additionally, as long as the Debtors are entitled to use borrowings under the DIP Facility or Cash Collateral pursuant to the terms of this Interim Order, the Debtors shall be permitted to pay all reasonable and necessary compensation and reimbursement of expenses allowed and payable under sections 330 and 331 of the Bankruptcy Code, pursuant to the Approved Budget.

**G.     Objections by Parties in Interest**

37.     Except as set forth herein and in the Interim Order, all of the provisions of the Interim Order shall be final and binding on the Debtors (including, without limitation, their successors and assigns), the Debtors' shareholders, and all creditors and other parties in interest, including any chapter 11 or chapter 7 trustee hereinafter appointed. The Committee and any party-in-interest with requisite standing (other than the Debtors) shall have until the lesser of (i) sixty (60) days of the entry of this Order or (ii) January 15, 2016 (the "Investigation Period"), to file, on behalf of the Debtors' estates, and to serve upon counsel for the DIP Lender and Kronstadt, an adversary complaint respecting (a) the claims, causes of actions and defenses released by the Debtors pursuant to the Interim DIP Order or Final DIP Order or (b) the validity, extent, priority, avoidability, or

enforceability of the Prepetition Obligations and the Prepetition Liens in the Kronstadt Collateral.  In the event that no adversary complaint is filed with this Court by the Committee or party-in-interest and served upon counsel for the DIP Lender by 5:00 p.m. Eastern Time on the last day of the Investigation Period, the provisions of the Interim DIP Order or Final DIP Order including, without limitation, the Debtors' Stipulations in the Interim DIP Order or Final DIP Order shall become final and binding for all purposes and upon all parties.

## BASIS FOR RELIEF REQUESTED

### The DIP Facility Should Be Authorized

38.    Approval of the DIP Facility will provide the Debtors with immediate and ongoing access to borrowing availability to fund their bankruptcy cases and to proceed with the Auction.  The Debtors need access to the DIP Facility in order to preserve the value of the Assets and to maximize value for their creditors.  Accordingly, the timely approval of the relief requested herein is imperative.

39.    Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(l) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or incur debt (a) with priority over any and all administrative expenses, as specified in section 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is subject to a lien.  11 U.S.C. § 364.  The Debtors propose to obtain the financing set forth in the DIP Orders and the DIP Loan Documents by providing, *inter alia*, superpriority claims, security interests, and liens pursuant to section 364(c)(l), (2), (3) and section 364(d) of the Bankruptcy Code.

40.     The Debtors' liquidity needs can be satisfied only if the Debtors are immediately authorized to borrow under the DIP Facility and to use such proceeds to fund operations.  The Debtors have been unable to procure sufficient financing in the form of unsecured credit allowable under section 503(b)(l), as an administrative expense under section 364(a) or (b), or in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(l).  The Debtors have not been able to obtain DIP Facility or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein.

41.     Bankruptcy courts grant a debtor considerable deference in acting in accordance with its business judgment.  See, e.g., Bray v. Shenandoah Fed. Say. & Loan Assn. (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986); In re Ames Dept. Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); see also In re Funding Sys. Asset Mgmt. Corp., 72 B.R. 87 (Bankr. W.D. Pa. 1987); In re Curlew Valley Assocs., 14 B.R. 506, 513-14 (Bankr. D. Utah 1981); In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985).

42.     Furthermore, section 364(d) does not require that a debtor seek alternative financing from every possible lender; rather, the debtor simply must demonstrate sufficient efforts to obtain financing without the need to grant a senior lien.  In re

Snowshoe Co., 789 F.2 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); In re 495 Central Park Ave, Co., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most lend money only in return for a senior secured position"); In re Aqua Assocs., 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) (debtor adequately established that some degree of priming of loan was necessary if debtor were to obtain funding).

43.     Substantially all of the Debtors' assets are encumbered and the Debtors have been unable to procure the required funding absent granting the proposed superpriority claims and liens.  The Debtors submit that the circumstances of these cases require the Debtors to obtain financing pursuant to section 364(c) and section 364(d) of the Bankruptcy Code and, accordingly, the DIP Orders and the DIP Loan Documents reflect the exercise of their sound business judgment.

44.     The terms and conditions of the DIP Loan Documents are fair and reasonable, and were negotiated by well-represented, independent parties in good faith and at arms' length.  Accordingly, the DIP Lender and DIP Lender and all obligations incurred under the DIP Loan Documents should be accorded the benefits of section 364(e) of the Bankruptcy Code.

### The Use of Cash Collateral Should Be Approved

45.     Under section 363(c)(2) of the Bankruptcy Code, a debtor in possession may not use cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use ... in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).  The Debtors

require the use of Cash Collateral to fund their bankruptcy cases and to proceed with the sale process and auction.  Indeed, absent such relief, the Debtors will be unable to preserve the value of their assets, with damaging consequences for the Debtors and their estates and creditors.  The interests of the DIP Lender in the Debtors' Cash Collateral will be protected by the adequate protection set forth above.  The DIP Lender has consented to the use of the Cash Collateral on the terms set forth herein and in the Order.  Accordingly, the Debtors request to use Cash Collateral in the operation of their businesses and administration of the chapter 11 cases should be approved.

## Section 364(e) Protections

46.      The terms and conditions of the DIP Orders are fair and reasonable, and were negotiated by well-represented, independent parties in good faith and at arms' length. Accordingly, the DIP Lender and all obligations incurred under the DIP Orders should be accorded the benefits of section 364(e) of the Bankruptcy Code.

## The Proposed Adequate Protection Should Be Authorized

47.      Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used . . . by [a debtor in possession], the court, with or without a hearing, shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest."   11 U.S.C. § 363(e). Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens, and other forms of relief.  11 U.S.C. § 361.  What constitutes adequate protection must be decided on a case-by-case basis.  See In re O'Connor, 808 F.2d 1393, 1396 (10th Cir. 1987); In re Martin, 761 F.2d 472 (8th Cir. 1985); In re Shaw Indus., Inc., 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003).  The focus of the requirement is to protect a secured creditor from diminution in

the value of its interest in the particular collateral during the period of use.  See In re Swedeland Dev. Group, Inc., 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citation omitted).

48.    The DIP Lender has agreed to the Debtors' use of Cash Collateral and the Debtors' entry into the DIP Loan Documents in consideration for the adequate protection provided under the DIP Loan Documents.    Accordingly, the adequate protection proposed herein to protect the DIP Lender's interest in the Kronstadt Collateral is fair and reasonable and sufficient to satisfy the requirements of sections 363(c)(2) and (e) of the Bankruptcy Code.

### The Automatic Stay Should Be Modified on a Limited Basis

49.    The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtors to (i) grant the security interests, liens, and superpriority claims described above with respect to the DIP Lender and Kronstadt, as the case may be, and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (ii) permit the DIP Lender to exercise, upon the occurrence of and during the continuance of an event of default, all rights and remedies under the DIP Loan Documents; and (iii) implement the terms of the proposed DIP Orders.

50.    Stay modifications of this kind are ordinary and standard features of post-petition debtor financing facilities and, in the Debtors' business judgment, are reasonable and fair under the present circumstances.

### **Interim Approval Should Be Granted**

51.     Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than fourteen (14) days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

52.     Pursuant to Bankruptcy Rules 4001(b) and (c), the Debtors request that the Court conduct an expedited preliminary hearing on this motion and (a) authorize the Debtors to borrow under the DIP Facility on an interim basis, pending entry of the Final Order, in order to avoid immediate and irreparable harm and prejudice to the Debtors' estates and all parties in interest, and (b) schedule a hearing to consider entry of the Final Order.

53.     The Debtors have an urgent and immediate need for cash to continue to operate. Currently, the Debtors do not have sufficient funds with which to fund their bankruptcy and protect and maintain the value of their assets.  Absent authorization from the Court to obtain secured credit, as requested, on an interim basis pending a final hearing on the motion, the Debtors will be immediately and irreparably harmed.  The interim relief requested is critical to facilitating the Debtors' reorganization efforts.

54.     The Debtors further submit that because the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein, Bankruptcy Rule 6003 has been satisfied.

55.    To successfully implement the foregoing, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen (14) day stay under Bankruptcy Rule 6004(h).

## Notice

56.    Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known:  (a) the Office of the United States Trustee; (b) counsel to the Debtors' prepetition secured lenders and post-petition secured lenders; (c) creditors holding the thirty (30) largest unsecured claims as set forth in the consolidated list filed with the Debtors' petitions; (d) the Office of the United States Attorney General for the District of Delaware; (e) the Internal Revenue Service; and (f) the Securities and Exchange Commission.  As the Motion is seeking "first day" relief, within two (2) business days of the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered respecting the Motion in accordance with the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

57.    No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter an order granting the Motion, substantially in the form annexed hereto, and grant such other and further relief as the Court deems just and proper.

Dated: December 2, 2015
      Wilmington, Delaware               BAYARD, P.A.

                                         */s/ Scott D. Cousins*
                                         Scott D. Cousins (No. 3079)
                                         Justin R. Alberto (No. 5126)
                                         222 Delaware Avenue, Suite 900
                                         Wilmington, Delaware 19801
                                         Phone: (302) 655-5000
                                         Facsimile: (302) 658-6395
                                         Email: scousins@bayardlaw.com
                                                 jalberto@bayardlaw.com

                                         *Proposed Attorneys for Debtors*
                                         *and Debtors-in-Possession*