## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| Axion International, Inc.[1] | Case No.: 15-12415 (CSS) (Jointly Administered) |
| Debtors. | **Bidding Procedures Objection Deadline: TBD** **Bidding Procedures Hearing Date: TBD** **Cure Objection Deadline: TBD** **Sale Objection Deadline: TBD** **Sale Hearing Date: TBD** |

## DEBTORS' MOTION FOR ORDERS (I)(A) AUTHORIZING AND APPROVING THE BIDDING PROCEDURES, (B) APPROVING CERTAIN NOTICE PROCEDURES, (C) APPROVING THE ASSUMPTION AND ASSIGNMENT PROCEDURES, AND (D) SETTING A DATE FOR THE SALE HEARING AND (II) AUTHORIZING AND APPROVING (A) THE SALE OF THE DEBTORS' ASSETS, AND (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS AND LEASES

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), hereby move (the "Motion") this court (the "Court") for the entry of orders pursuant to sections 105, 363, 365 and 503 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") (i)(a) authorizing and approving the proposed bidding procedures (the "Bidding Procedures") (attached as Exhibit I to the proposed form of Bidding Procedures Order attached hereto as Exhibit A) for the sale of substantially all of the Debtors' assets (the "Purchased Assets"), as

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Axion International, Inc. [1880], Axion International Holdings, Inc. [6389], Axion Recycled Plastics Incorporated [5048]. The address of the Debtors' corporate headquarters is 4005 All American Way, Zanesville, OH 43701.

described more fully herein (the "Sale"), (b) authorizing and approving the terms and conditions of the proposed break up fee (the "Break Up Fee") and reimbursement of expenses (the "Expense Reimbursement" and together with the Break Up Fee, the "Bid Protections"), (c) approving the form and manner of the notice regarding the Sale and related Sale Hearing (the "Sale Notice") and the Cure Notice (as defined below), (d) approving the procedures for assumption and assignment (the "Assumption and Assignment Procedures") of certain of the Debtors' prepetition executory contracts and leases of nonresidential real property (collectively, the "Assumed Contracts and Leases"), and (e) setting the time, date and place of a later hearing (the "Sale Hearing") to consider the Sale; (ii) authorizing and approving (a) the Sale of the Purchased Assets free and clear of any charge, claim, condition, equitable interest, lien (including without limitation any lien held or asserted by any governmental authority), option, pledge, security interest, mortgage, right of way, easement, encroachment, servitudes, right of first option, right of first refusal, or similar restriction, including restrictions of use, voting (in the case of any security or equity interest), transfer, receipt of income or exercise of any attribute of ownership, or other encumbrance, option or defect in title of every type and description, whether imposed by law, agreement, understanding or otherwise, including, without limitation, all liens, encumbrances, and interests in property as set forth in Section 363 of the Bankruptcy Code (except for Assumed Liabilities as that term is defined in the Term Sheet attached hereto as Exhibit B) (collectively, the "Encumbrances and Interests"), (b) the assumption and assignment of the Assumed Contracts and Leases pursuant to section 365 of the Bankruptcy Code, and (c) waiving the fourteen-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d); and (iii) granting such other and further relief as

the Court deems just and proper.  In support of this Motion, the Debtors rely on the Declaration of Donald W. Fallon in Support of Chapter 11 Petitions and Related Motions (the "Fallon Declaration").  In further support of the Motion, the Debtors respectfully represent as follows:

**Jurisdiction, Venue and Predicates for Relief**

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157 (b)(2).

2.      The statutory bases for the relief requested herein are sections 105, 363, 365, and 503 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9014, and Local Rule 6004-1.

**Background**

A.      **Introduction**

3.      On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code, commencing the above-captioned chapter 11 cases.  The Debtors continue to operate their businesses and manage their properties as a debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.      No creditors' committee has been appointed in this case.  No trustee or examiner has been appointed.

5.      A full description of the Debtors' business operations, corporate structures, capital structures, and reasons for commencing these cases is set forth in the

Fallon Declaration, which was filed contemporaneously with this Motion and which is incorporated herein by reference.

### B. The Debtors' Business Operations

6.     Axion International Holdings, Inc. ("Holdings") is a publicly-traded company (AXIH), organized under Colorado law, with executive offices located in Zanesville, Ohio. As of the Petition Date, Holdings had 54,121,611 shares of common stock, par value $0.016 per share, traded on the OTCC Bulletin Board. Axion International, Inc. ("Axion International"), a Delaware corporation, is a wholly-owned subsidiary of Holdings, and Axion Recycled Plastics Incorporated ("Axion Recycling"), an Ohio corporation, is a wholly-owned subsidiary of Axion International. The Debtors employ approximately 70 individuals as of the Petition Date.

7.     The Debtors manufacture, market and sell structural products and building materials, with an emphasis on railroad ties and construction mats. Using patented technology and proprietary know-how, the Debtors transform post-consumer and post-industrial recycled plastics, such as high-density polyethylene and glass-filled polypropylene, into products that are ideal replacements for similar products made from traditional materials such as wood, steel or concrete. Compared to traditional materials, the Debtors' products are cost competitive, and feature longer life cycles and lower maintenance costs. The Debtors' manufacturing facilities (both of which are leased) are located in Zanesville, Ohio and Waco, Texas.

8.     The Debtors' strategic focus has been to (i) expand manufacturing capacity to meet current demand for their railroad ties and construction and temporary road mats; (ii) further penetrate chosen end-use markets in the railroad, transportation, and oil and gas industries; (iii) identify new applications for the Debtors' proprietary

technologies based on market research and geographic segmentation; and (iv) spread exposure to risk and liability through product stratification.

9.      The Debtors have been plagued by a lack of liquidity requiring a reduction in production capacity.  The Debtors' principal costs and expenses include raw materials and expenses associated with production and manufacturing.  To compensate for the liquidity challenges, the Debtors were forced to reprocess slow-moving and obsolete products into new products and to liquidate inventory at lower sales prices in order to induce customers to purchase and/or accept shorter payment terms.

10.      Due to the liquidity issues, recurring losses from operations, and negative operating cash flows, the Debtors' recently questioned in notes to their financial statements their ability to continue as a going concern.  The actions taken by the Debtors to decrease production activity, liquidate available inventory and to seek additional capital investment from both public and private sources have proved largely unsuccessful.  Through funds made available prior to the Petition Date and the proposed DIP Facility (defined below), the Debtors are purchasing raw materials and rebuilding relationships with vendors who are necessary to the production side of the Debtors' business.

### C.      The Debtors' Prepetition Capital Structure

<u>Mr. Kronstadt's Holdings</u>

11.      Commencing in August, 2012, Allen Kronstadt, along with two other individuals and/or their affiliates, began to actively invest in the Debtors through the purchase of 8% secured convertible notes for which they were also issued warrants. Upon his initial investment of approximately $2.4 million, Mr. Kronstadt was elected to the Debtors' board of directors.   Through December 31, 2014, Mr. Kronstadt purchased

$5.2 million of the 8% notes (the notes are collectively referred to as the "<u>Kronstadt Secured Notes</u>" and the debt owed pursuant thereto, is referred to as the "<u>Kronstadt Secured Indebtedness</u>").  In addition to these notes, Mr. Kronstadt thereafter purchased $666,667 of a different series of 8% convertible notes, $333,333 of 12% convertible notes and approximately $2.4 million of a series of 12% notes, which were secured by a pledge of Holdings' equity interest in Axion Recycling and Axion International (collectively, the "<u>Additional Kronstadt Indebtedness</u>").  Mr. Kronstadt never converted any of the Kronstadt Secured Notes.  On June 9, 2015, Mr. Kronstadt resigned from the Debtors' board of directors.

12.    When the Debtors, in anticipation of an up-listing to a national exchange in April 2015, initiated a tender offer to acquire their outstanding warrants in exchange for the issuance of shares, Mr. Kronstadt tendered his warrants and obtained 10.9 million shares of the Debtors' common stock.  Mr. Kronstadt was also issued approximately 1.6 million shares of common stock as interest on his convertible notes.  Until the two other investors with whom Mr. Kronstadt invested forgave their debt and relinquished part of their shares in October, 2015, Mr. Kronstadt held a 17.8% interest in the Debtors' common stock.  As a result of the relinquishment, Mr. Kronstadt became a 20.1% stockholder.

13.    On November 24, 2015, Mr. Kronstadt tendered to the Debtors in exchange for $2.00 the Additional Kronstadt Indebtedness.  He also tendered back to the Debtors in exchange for $2.00 all shares of common stock, stock options and warrants registered in his individual name.  As of the date hereof, 224,803 shares of common stock are held by a tax-exempt foundation established by Mr. Kronstadt and trusts established

for the benefit of Mr. Kronstadt's direct descendants.  Mr. Kronstadt no longer holds shares of the Debtors in his individual name.

14.     As a result, as of the Petition Date, the total principal sum owed to Mr. Kronstadt by the Debtors pursuant to the Kronstadt Secured Notes (excluding legal fees, accrued interest and other charges) is approximately $5.2 million.  The Kronstadt Secured Notes are secured by (i) second-priority perfected security interests in the Ohio State Collateral (as defined below) and the Community Bank Collateral (as defined below), and (ii) a first-priority perfected security interest in all of the other assets of the Debtors.

The Debtors' Other Debt

15.     On November 15, 2013, Axion Recycling entered into an asset purchase agreement to acquire certain assets of a recycled plastics facility located in Zanesville, Ohio.  As a component of the consideration paid for these assets, the Debtors assumed a 3% promissory note payable to the State of Ohio with a remaining principal balance of $236,201 as of June 30, 2015 (the "Ohio State Note").  The Ohio State Note is secured by first-priority liens encumbering certain equipment owned by Axion Recycling (the "Ohio State Collateral").

16.     In 2013, the Debtors entered into two term loans with The Community Bank (together with Mr. Kronstadt and the State of Ohio, the "Prepetition Lien Holders") in the aggregate principal amounts of $1,000,000 and $3,500,000 (the "Community Bank Debt").  The Community Bank Debt bears interest at 4.25% per annum, is secured by first-priority liens encumbering certain identifiable equipment owned by the Debtors (the "Community Bank Collateral") and matures on November 15, 2018.

17.    During 2014, the Debtors borrowed $4,000,000 from EagleBank pursuant to the terms of a promissory note and loan agreement (the "EagleBank Debt").  Interest accrues on the outstanding principal at a fixed interest rate of 5% per annum and is payable monthly.  All outstanding principal and accrued but unpaid interest is due on September 18, 2017.  The EagleBank Debt is one-third guaranteed by Mr. Kronstadt, but is not secured by any of the Debtors' assets.

### D.    Events Leading to the Chapter 11 Filings

18.    As noted above, the Debtors are facing a liquidity crisis requiring a curtailment of production, and are therefore unable to meet customer demands.  In addition to their cash flow crisis, as of September 30, 2015, the Debtors had a working capital deficit of $10,100,000, a stockholders' deficit of $31,500,000 and accumulated losses of $86,200,000 million.  Further details of the Debtors' financial performance can be found in the Debtors' most recently filed Form 10Q (Quarterly Report pursuant to Section 14 or 15(d) of the Securities Exchange Act of 1934) for the quarterly period ending September 30, 2015, filed on or about November 16, 2015.

19.    In order to address the issues facing the Debtors' businesses, the Debtors undertook a series of activities designed to enable the Debtors to remain in business while they considered their alternatives.  These activities primarily consisted of ceasing the reengineering and build out of the Zanesville facility to support additional manufacturing, liquidating inventory at favorable prices and securing orders with favorable pricing terms from customers who had an interest in the Debtors' survival.

20.    On April 25, 2015, the Debtors retained, on a nonexclusive basis, Gordian Group, LLC ("Gordian") to provide financial advisory and investment banking services.  In connection with its nonexclusive engagement, Gordian advised the Debtors with

respect to the potential restructuring of their outstanding indebtedness. The Debtors and Gordian, either together or independently, considered over 300 potential strategic and financial investors, creditors, equity holders and other parties in interest with respect to potential investments, financings, mergers or sales of the Debtors. The Debtors or Gordian contacted 177 of these potential investors and partners. Of those interested parties, 134 received additional information and 106 signed confidentiality agreements and were granted access to the Debtors' electronic data room, financial models and customer information. Of those parties, 74 had discussions with management respecting a potential investment, financing, merger or sale of the Debtors, with over 70% of these parties stemming from the Debtors' independent marketing efforts or from prospects given to Gordian by the Debtors to manage. Several strategic purchasers surfaced and the Debtors pursued preliminary merger/investment discussions with another strategic party it identified. In addition, two private equity funds expressed interest, but after extensive due diligence, determined not to present a term sheet. At one point, the Debtors were able to secure a non-binding letter of intent ("LOI") from an asset-based lender which conducted extensive due diligence, but after approximately five weeks withdrew its LOI.

21.     In all cases, the Debtors tried to accommodate all reasonable requests upon expressions of interest, including arranging calls with key customers, engaging in face to face meetings, arranging calls with the Debtors' outside counsel, developing financial models based upon potential investee assumptions and always making the Debtors' management available to answer questions. In addition, to aid potential investment, the Debtors attempted to negotiate a reduction and restructuring of The

Community Bank's loan, to have its preferred stockholders forego their put right and to convert to common stock, and to secure investors to potentially co-invest alongside Mr. Kronstadt who had indicated his desire to invest in the Debtors if additional investors could be obtained.

22.    Despite the Debtors' efforts, the search for strategic alternatives proved unsuccessful, and while the Debtors have been able to negotiate certain modifications to the terms of certain equity and debt securities issued by the Debtors, the Debtors' financial position remains dire.  Based on the current financing environment coupled with the Debtors' weak financial condition, the Debtors determined that no outside sources of capital would be willing to fund the Debtors under their current capital structure.

23.    After all possibilities were exhausted and the Debtors' ability to remain in business was threatened because of liquidity concerns, Mr. Kronstadt, through Plastic Ties LLC (the "DIP Lender"), facilitated negotiations for a DIP loan (the "DIP Facility") and effectively a bridge loan to enable the Debtors to reach chapter 11 with sufficient funding.  Mr. Kronstadt is the Manager of the DIP Lender.

24.    After extensive negotiations with their lenders, a review of various liquidation and sale recovery scenarios and discussions with the Debtors' professionals, the Board ultimately determined in the exercise of their reasonable business judgment that the most effective way to maximize the value of the Debtors' estates for the benefit of their constituents is to seek bankruptcy protection.  The Debtors believe that proceeding under chapter 11 will enable them to achieve a new capital structure to operate as a going concern, fund their operations and obligations in the ordinary course,

and maximize the value of such assets with reduced potential risks, contingencies and uncertainties.

        **E.**       **The Term Sheet and Asset Purchase Agreement**

      25.    As indicated above, notwithstanding substantial prepetition marketing efforts, the Debtors were unable to find investors or buyers willing to (i) provide sufficient financing to fund ongoing operations and pay amounts owing to the Prepetition Lien Holders or (ii) purchase the Debtors' assets for an amount that would pay off the Prepetition Lien Holders in full.  As a result, the Debtors have concluded that the sale of their assets pursuant to section 363 with an open and competitive auction process will maximize the value of their assets for the benefit of creditors.

      26.    The Debtors are currently negotiating the terms of an asset purchase agreement (the "APA", which will be consistent with the Term Sheet attached hereto as Exhibit B) for the sale of all or substantially all of their assets to Mr. Kronstadt (or his designee) (the "Purchaser"), subject to higher and better bids and court approval.  As consideration, the Purchaser would credit bid at least $3.2 million of the Kronstadt Secured Indebtedness, and: (i) through the entity designated to take title to the Purchased Assets, assume the balance of of the Kronstadt Secured Indebtedness that is not credit-bid; (ii) assume the full remaining balance of the DIP Facility that is not credit-bid; (iii) pay the cure costs ("Cure Costs") for Assumed Contracts and Leases (as negotiated by Purchaser and the counterparties), and (iv) make a cash payment of $500,000 to acquire the Ohio State Collateral and the Community Bank Collateral.  The Debtors and Purchaser have agreed to file an asset purchase agreement memorializing the terms and conditions of the Term Sheet no later than five (5) business days before the hearing to consider approval of the Bidding Procedures.

27.     The Debtors believe it is in the best interests of their estates, creditors, customers and employees to commence a bidding process immediately, as the Debtors have limited funding and resources to try to maximize the value of their assets.  Indeed, the DIP Facility is available only for a short period of time.  Although the Debtors are operating on reduced expenses, it is unlikely they will be able to continue operating beyond the period of this proposed bidding process without additional funding, the source of which would be uncertain.

28.     The Debtors evaluated the terms of the Purchaser's offer with the assistance of their professionals and, in their reasoned business judgment, concluded that the Term Sheet represents the best opportunity to initiate a sale process that will maximize creditor recoveries (both in terms of purchase price and in terms of maintaining production operations).  The Debtors have marketed and will continue marketing their assets and business in an effort to solicit further interest from both strategic acquirers and financial buyers and investors.  The proposed Sale is subject to higher or better offers and is contingent in part on the Purchaser receiving the Bid Protections.

29.     The counterparties to the Assumed Contracts and Leases can be assured of future performance by the Purchaser.  The Purchaser (backed by Mr. Kronstadt and potentially other investors) has financial credibility, business expertise and a proven record of success, sufficient working capital to operate and manage the Purchased Assets, and both the intent and proven access to resources to satisfy all obligations required under the Assumed Contracts and Leases following the closing of the Sale.  The Purchaser and the Debtors believe that the Purchaser has demonstrated adequate assurance of future performance of, and under, the Assumed Contracts and Leases within the requirements of

sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code, to the extent applicable to the Assumed Contracts and Leases.

      **F.**      **Proposed Timeline**

      30.      The Debtors desire to receive the greatest value for the Purchased Assets. Although the Debtors believe the proposed Term Sheet and impending APA are fair and reasonable and reflect the highest and best value under the circumstances for the Purchased Assets, and although they marketed their assets prepetition, the Debtors nevertheless intend to offer the assets for sale in the hope that higher and better bids are generated for all or a portion of the Purchased Assets.

      31.      The DIP Facility contemplates a forty-eight (48) day sale process in these cases. The Debtors believe that this timeframe is appropriate given its prepetition marketing efforts and its ongoing liquidity problems.

      32.      The Debtors propose the following timeline in connection with the relief sought in this Motion:

| EVENT | DATE |
|-------|------|
| Bidding Procedures Hearing | December 23, 2015 |
| Objection Deadline for Sale Hearing | January 12, 2016 at 4:00 p.m. |
| Bid Deadline | January 15, 2016 at 5:00 p.m. |
| Auction Date (if necessary) | January 18, 2016 at 10:00 a.m. |
| Sale Hearing | January 19, 2016 |

      33.      The Debtors believe that after months of exploring both potential financial and strategic alternatives prepetition, every party that reasonably could be expected to consummate a transaction with the Debtors was contacted by the Debtors or their advisors. The Bidding Procedures were developed consistent with the Debtors' competing needs to expedite the sale process and promote participation and active

bidding.  Moreover, the Bidding Procedures reflect the Debtors' objective of conducting the Auction in a controlled, but fair and open, fashion.

34.    Absent a prompt sale pursuant to the proposed procedures and timeline, the Debtors believe that the going concern value of the Purchased Assets may be significantly compromised, rendering the possibility of a sale unlikely.  The Debtors therefore submit that the proposed timeline is more than sufficient to complete a fair and open process that will maximize value for the Debtors' assets while at the same time preserve the going concern value.

### Relief Requested

35.    By this Motion, the Debtors seek orders: (i)(a) authorizing and approving the Bidding Procedures, (b) authorizing and approving the terms and conditions of the Bid Protections, (c) approving the form and manner of Sale Notice attached to the Bidding Procedures Order as Exhibit II, (d) approving the Assumption and Assignment Procedures and the form and manner of the Cure Notice (as defined below), and (e) setting the time, date, and place of the Sale Hearing (such order, substantially in the form attached hereto as Exhibit A the "Bidding Procedures Order"); and (ii) authorizing and approving (a) the Sale of the Debtors' rights, title and interests in the Purchased Assets free and clear of all Encumbrances and Interests, (b) the assumption and assignment of the Assumed Contracts and Leases (such order, substantially in the form attached hereto as Exhibit C, the "Sale Order"); and (iii) granting it such other relief as the Court deems just and proper.

### A.    Compliance with Local Rule 6004-1

36.    Local Rule 6004-1 states that a sale motion:

> must highlight material terms, including but not limited to (a) whether the proposed form of sale order and/or the underlying purchase agreement constitutes a sale or contains . . . [certain enumerated provisions], (b) the location of any such provision in the proposed form of order or purchase agreement, and (c) the justification for the inclusion of such provision."

Del. Bankr. L.R. 6004-1(b)(iv).   In addition, "[a] debtor may file a Sale Procedures Motion seeking approval of an order . . . approving bidding and auction procedures either as part of the Sale Motion or by a separate motion in anticipation of an auction and a proposed sale."  Del. Bankr. L.R. 6004-1(c).  As with a sale motion, the Local Rules provide that a debtor must highlight certain bid procedures order provisions in the motion seeking approval of the same.  Del. Bankr. L.R. 6004-1(c)(i).

37.    By this Motion, the Debtors seek approval of, *inter alia*, bid and auction procedures and a sale of the Debtors' assets.  The Debtors have therefore highlighted the relevant provisions of both the Bidding Procedures and the Term Sheet below in accordance with Local Rule 6004-1.

### i.    Bidding Procedures

38.    The Debtors request authority to solicit bids for the Purchased Assets utilizing the Bidding Procedures, substantially in the form attached as Exhibit I to the Bidding Procedures Order and summarized below.  The Bidding Procedures describe, among other things, the assets to be sold, the manner in which bids become "qualified," the coordination of diligence efforts among potential bidders, the Debtors, and their advisors and management, the receipt and negotiation of bids received, the conduct of any auction, and the selection and approval of the Successful Bidder (as defined in the Bidding Procedures).

39.     While the Debtors believe that the terms of the Term Sheet and impending APA are fair and reasonable and reflect the highest and best value for the Purchased Assets, the Debtors nevertheless desire to allow any parties that may have an interest in purchasing the Purchased Assets a further opportunity to make a bid.   The Bidding Procedures were developed consistent with the Debtors' competing needs to conduct an expedited sale process and to promote participation and active bidding and to comply with the terms and conditions of the DIP Facility.   Moreover, the Bidding Procedures reflect the Debtors' objective of conducting an auction in a controlled, but fair and open, fashion, while ensuring that the highest and best bid is generated for the Purchased Assets.

40.     The material terms of the Bidding Procedures are as follows:[2]

| | |
|---|---|
| **Provisions Governing Qualification of Bidders** | *Obligation to Deliver Financial Information to Debtors.*   To participate in the bidding process and to receive access to the Diligence Materials, a party must submit to the Debtors<br><br>(a)   An executed confidentiality agreement substantially in form and substance satisfactory to the Debtors; and<br><br>(b)   Current audited financial statements or, if the Potential Bidder is an entity formed for the purpose of acquiring the Purchased Assets, current audited financial statements of the equity holder(s) of the Potential Bidder or such other form of financial disclosure acceptable to the Debtors. |
| **Provisions Governing Qualified Bids** | *Bid Deadline.*   The Debtors propose that the Bid Deadline be set for January 15, 2016 at 5:00 p.m. (prevailing Eastern Time).<br><br>*Form of Bid.*   In order to be eligible to participate in the Auction, a Bidder must deliver to the Debtors, counsel to the Debtors, and any legal and financial advisors to any statutory committee |

---

[2] The following description of the Bidding Procedures is a summary of the terms set forth in the Bidding Procedures attached to the Bidding Procedures Order as <u>Exhibit I</u>.  To the extent of any conflict between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern.  Capitalized terms used but not defined in this section shall have the meanings ascribed to them in the Bidding Procedures or the Term Sheet, as applicable.

appointed in these cases a written offer, which must provide or otherwise comply with, at minimum, the items noted below to be deemed a "Qualified Bid":

(a) <u>Good Faith Deposit</u>: ten percent (10%) of the purchase price;

(b) <u>Same or Better Terms</u>: each Bid must be on terms that the Debtors determine are the same or better than the terms of the APA;

(c) <u>Executed Agreement</u>: include a marked copy against the APA to show all changes requested by the Bidder and must provide a commitment to close within three (3) business days after all closing conditions are met;

(d) <u>Minimum Bid</u>: propose a purchase price greater than the sum of (i) the purchase price of the APA, (ii) the Bid Protections, and (iii) $150,000;

(e) <u>Designation of Assigned Contracts and Leases</u>: identify any and all executory contracts and unexpired leases of the Debtors that the Bidder wishes to be assumed and assigned to the Bidder, provided however that a Bidder shall have the right to modify this list at any time prior to closing;

(f) <u>Designation of Assumed Liabilities</u>: identify any liabilities which the Bidder proposes to assume;

(g) <u>Corporate Authority</u>: include written evidence demonstrating appropriate corporate authorization to consummate the transaction;

(h) <u>Disclosure of Identity of Bidder</u>: disclose the identity and contact information of the Bidder;

(i) <u>Proof of Financial Ability to Perform</u>: include written evidence demonstrating that the Bidder has the necessary financial ability to close the transaction, which information must include: (i) contact information for verification of financing resources; (ii) evidence of the Bidder's internal resources and proof of any debt and equity commitments in an aggregate amount equal to the cash portion of the Bid or the posting of an irrevocable letter of credit in that amount; (iii) a description of the Bidder's pro forma capital structure; (iv) the Bidder's current financial statements; and

| | |
|---|---|
| | (v) any other form of financial disclosure reasonably acceptable to the Debtors; |
| | (j) <u>Regulatory and Third-Party Approvals</u>: set forth each regulatory and third-party approval required for the Bidder to consummate the transaction and the time period within which the Bidder expects to receive such approvals; |
| | (k) <u>Contingencies</u>: each Bid must not be conditioned on obtaining financing or on the outcome or review of due diligence; |
| | (l) <u>Irrevocable</u>: each Bid must be irrevocable until conclusion of the Sale Hearing, *provided* that if the Bid is accepted as the Successful Bid or the Backup Bid, such bid shall continue to remain irrevocable; |
| | (m) <u>Compliance with Information Requests</u>: each Bidder must comply with reasonable requests for additional information from the Debtors; |
| | (n) <u>Confidentiality Agreement</u>: to the extent not already executed, the Bid must include an executed confidentiality agreement; |
| | (o) <u>Termination Fees</u>: contain no entitlements to any break-up fee, termination fee or similar type of fee or reimbursement; and |
| | (p) <u>DIP Facility</u>: provide for, as a condition to closing, the repayment of all amounts outstanding under the DIP Facility; |
| | (q) <u>Credit Bid</u>: With respect to the Purchaser, it shall be entitled to credit bid under section 363(k) of the Bankruptcy Code for any or all of the Purchased Assets; and |
| | (r) <u>Bid Deadline</u>:  A Bid must be received on or before the Bid Deadline. |
| **The Purchaser's Bid Protections** | *Break Up Fee and Expense Reimbursement*.  The Bidding Procedures require the Debtors to pay, in certain circumstances, a (i) $550,000 Break Up Fee, and (ii) the Purchaser's reasonable costs and expenses, including reasonable attorneys' fees, up t0 $250,000. |

| | |
|---|---|
| | *Bidding Increments*.   Bidding at the Auction will start at the Auction Baseline Bid and will continue with minimum bid increments of $150,000. |
| **Modification of Bidding Procedures** | The Bidding Procedures may be modified by the Debtors as they may determine to be in the best interests of the estate; *provided* that any such modifications are not inconsistent with any Bankruptcy Court order. |
| **Closing With Alternative Back-Up Bidder(s)** | If an Auction is conducted, the Qualified Bidder with the next highest or otherwise best Bid at the Auction will be designated as the Backup Bidder.  The Backup Bidder shall be required to keep its Backup Bid open and irrevocable until the earlier of (i) thirty (30) days after the Sale Hearing, or (ii) the closing of the transaction with the Successful Bidder. |
| **Provisions Governing the Auction** | *Date/Time/Place of Auction*.  In the event the Debtors receive one or more Qualified Bids (other than the APA), the Debtors propose to hold an auction on January 18, 2016, commencing at 10:00 a.m. (eastern), at the offices of Bayard, P.A., 222 Delaware Avenue, Suite 900, Wilmington, Delaware 19801.<br><br>*No Collusion*.  Each Qualified Bidder will be required to confirm that it has not engaged in any collusion with respect to the Auction or the proposed sale.<br><br>*Participation and Attendance*.   The Debtors and their representatives, the Purchaser, proper representatives of any statutorily appointed committees, and any other Qualified Bidder shall participate at the Auction in person, and only the Purchaser and such other Qualified Bidders will be entitled to make any subsequent bids at the Auction.  Any creditor of the Debtors may attend the Auction in person.<br><br>*Transcription*.  The Debtors shall arrange for the Auction to be transcribed. |

41.    The Debtors submit that implementation of the Bidding Procedures will not chill bidding for the Purchased Assets.  Rather, approval of the Bidding Procedures is in the best interests of the Debtors, their estate, and their creditors in that it provides a structure and format for other potentially interested parties to formulate a bid for the Purchased Assets.  Failure to approve the Bidding Procedures may jeopardize the Sale to

the Purchaser to the detriment of the Debtors' creditors, employees, customers and vendors.

### ii.    Proposed Sale to the Purchaser

42.    After arm's-length, good faith negotiations among the Debtors and the Purchaser and their respective advisors, the parties have agreed, among other things, to convey the Purchased Assets and assign the Assumed Contracts and Leases to the Purchaser in accordance with the terms and conditions of the Term Sheet and impending APA, subject to higher and better offers and this Court's approval.  The Debtors have determined that the Term Sheet and impending APA represent the best opportunity for the Debtors to maximize the value of their assets and to serve as a basis for conducting an auction to seek higher and/or better offers.  The Term Sheet contemplates the sale of the Purchased Assets, subject to higher and/or better bids, on the following material terms:[3]

| Sale to Insider | The Purchaser is a former director of the Debtors and has been involved in the Debtors' capital structure since 2012, as further described in this Motion. |
|---|---|
| Purchase Price | The total consideration to be paid to the Debtors for the Purchased Assets at the Closing shall consist of (i) a credit bid of at least $3.2 million of the Kronstadt Secured Indebtedness, (ii) the assumption by the Purchaser of certain liabilities set forth in the Term Sheet (including so much of the DIP Facility and the Kronstadt Secured Indebtedness as has not been used by the Purchaser as a credit bid); (iii) the payment of any Cure Costs relating to the Assumed Contracts and Leases and (iv) cash totaling $500,000 (to be allocated between the State of Ohio and The Community Bank) to acquire all assets as to which the liens and security interests of the Kronstadt Secured |

---

[3]    The highlighted terms and summary of the Term Sheet is provided for the benefit of the Court and other parties in interest.  The Term Sheet is incorporated herein by reference.  To the extent of any conflict between this summary and the Term Sheet, the terms of the Term Sheet shall govern. Capitalized terms used but not otherwise defined in this summary shall have the meanings ascribed to them in the Term Sheet.

| | |
|---|---|
| | Indebtedness and the DIP Facility are not in a first-priority perfected position (which cash shall be used by the Debtors to satisfy the senior liens secured by such assets).<br><br>Term Sheet, pp. 1-2. |
| **Agreements with Management** | Pursuant to the Term Sheet, the Purchaser may initiate, in its discretion, the process of hiring personnel appropriate for the continued operation of the business.  The Debtors and Purchaser will reasonably cooperate with one another to initiate the hiring process prior to closing on the Sale and after there is clarity as to whether the Purchaser will be the prevailing purchaser.   The Debtors' current management will not enter into employment contracts with the Purchaser before closing.<br><br>Term Sheet, p. 4. |
| **Release** | In connection with the closing, the Debtors shall execute a release in favor of the Purchaser and Mr. Kronstadt (and their affiliates, agents, attorneys, and employees), releasing the Purchaser and Mr. Kronstadt from all causes of action and claims that the Debtors have or may have against the Purchaser, in each case as of the closing.<br><br>Term Sheet, p. 7. |
| **Auction to be Conducted** | As described more thoroughly in the Bidding Procedures, the Debtors intend to conduct an open auction process if one or more Qualified Bids are received (other than the APA). |
| **Closing and Other Deadlines** | The Debtors and Purchaser are negotiating the closing date in connection with finalizing the APA. |
| **Good Faith Deposit** | The Purchaser is not required to make a good-faith deposit under the Term Sheet, but did arrange for the DIP Lender to provide the DIP Facility. |
| **Interim Arrangements with Proposed Buyer** | The Term Sheet does not contain any provision pursuant to which the Debtors are entering into any interim agreements or arrangements with the Purchaser. |
| **Use of Proceeds** | The Term Sheet does not contain any provisions relating to the Debtors' use of the proceeds. |
| **Record Retention** | Prior to closing, the Debtors are free to make duplicate copies of their books and records.   Any post-closing |

| | |
|---|---|
| | maintenance of such records shall be at the cost of the estates. An index of all documents duplicated by the Debtors shall be provided to the Purchaser. Post-closing the purchaser will provide reasonable access to the Debtors to the pre-closing books and records.<br><br>Term Sheet, p. 3. |
| **Sale of Avoidance Actions** | The Sale does not include the sale of avoidance actions to the Purchaser.<br><br>Term Sheet, p. 3. |
| **Requested Findings as to Successor Liability** | The APA is conditioned on the Sale Order finding that the Purchaser will not have any successor or transferee liability whatsoever for liabilities of the Debtors (whether under federal or state law or otherwise) as a result of the Sale.<br><br>Term Sheet, pp. 5-6. |
| **Credit Bid** | The consideration to be paid by the Purchaser includes, among other things, a credit bid of at least $3.2 million of the Kronstadt Secured Indebtedness against all assets as to which the Kronstadt Secured Indebtedness is secured by liens and security interests senior to all creditors other than the DIP Lender.<br><br>Term Sheet, pp. 1-2. |
| **Relief from Bankruptcy Rule 6004(h)** | The Debtors are seeking relief from the fourteen-day stay provided by Bankruptcy Rule 6004(h).<br><br>Sale Order, ¶ 29. |

43.     The Debtors have limited production operations and urgent cash needs. The Purchaser has agreed to provide for enough funding through the DIP Facility to allow the Debtors to maintain production operations as they pursue a sale of their assets, but the funding is limited and will expire on January 19, 2016. The purchasing of raw materials and maintaining production operations, combined with a sale of the Debtors' assets, will help restore confidence with those parties the Debtors have done business.

Thus, the Debtors submit that the value of their assets will be maximized if their assets are immediately marketed and sold.

44.     In short, an asset sale is the proper response to the challenges the Debtors face in attempting to maximize the value of their estates.  The Purchased Assets are likely to generate the highest returns if the Debtors' businesses are sold to an entity (like the Purchaser) with access to capital and a clear motivation to continue, and improve, the Debtors' operations.  The Debtors believe and submit that the terms of the Term Sheet are fair and reasonable under the circumstances and reflect the best value currently available for the Purchased Assets.

### B.     The Notice Procedures

45.     The Debtors propose to give notice within three (3) business days after the entry of the Bidding Procedures Order, of the time and place of the Auction, the time and place of the Sale Hearing, and the objection deadline for the Sale Hearing by sending the Sale Notice, substantially in the form attached as Exhibit II to the Bidding Procedures Order, to (i) all entities known to have expressed an interest in a transaction with respect to some or all of the Purchased Assets at any time; (ii) all entities known to have asserted any lien, claim, interest or encumbrance in or upon any of the Purchased Assets; (ii) all federal, state and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by this Motion; (iv) the United States Attorney's office; (v) the Securities and Exchange Commission; (vi) the Internal Revenue Service; (vii) legal and financial advisors to any statutory committee appointed; (viii) the parties included on the Debtors' list of thirty (30) largest unsecured creditors; and (ix) those parties who have filed the appropriate notice requesting notice of all pleadings filed in these cases.

### C.    The Assumption and Assignment Procedures

46.    The Debtors propose a set of procedures to facilitate the Sale which would involve the assumption and assignment of the Assumed Contracts and Leases.    The proposed Assumption and Assignment Procedures are contained in the Notice of Cure Amount With Respect to Executory Contracts or Unexpired Leases to be Assumed and Assigned (the "Cure Notice"), attached to the Bidding Procedures Order as Exhibit III. The Debtors will serve the Cure Notice on all non-debtor counterparties to the Assumed Contracts and Leases within three (3) days after entry of the Bidding Procedures Order.

47.    The Debtors will attach to the Cure Notice its calculations of the undisputed cure amounts that the Debtors believe must be paid to cure all prepetition defaults under all Assumed Contracts and Leases (the "Cure Amount").    The Debtors request that unless the counterparty files and serves upon the appropriate notice parties an objection by the applicable deadline set forth in the Cure Notice (the "Cure Objection Deadline"), such non-debtor party should (a) be forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts with respect to such Assumed Contract or Lease, and the Debtors shall be entitled to rely solely upon the Cure Amount, and (b) be forever barred and estopped from asserting or claiming against the Debtors, the Purchaser or the Successful Bidder, as the case may be, or any other assignee of the Assumed Contract or Lease that any additional amounts are due or defaults exist, or conditions to assumption and assignment must be satisfied with respect to such Assumed Contract or Lease.

48.    In the event that an objection is timely filed and served, the objection must set forth (i) the basis for the objection and (ii) the amount the party asserts as the Cure Amount.    After receipt of the objection, the Debtors will attempt to reconcile any

differences in the Cure Amount believed by the counterparty to exist.  In the event, however, the Debtors and the counterparty cannot consensually resolve the Cure Amount and such dispute must be resolved, the Debtors will segregate any disputed portion of the Cure Amount pending the resolution of any such disputes by this Court or mutual agreement of the parties.

49.    In the event that the Successful Bidder is not the Purchaser, immediately after the conclusion of the Auction, the Debtors will serve notice identifying the Successful Bidder upon each counterparty to an executory contract or unexpired lease to be assumed and assigned to the Successful Bidder.   In this circumstance, each counterparty may object to the assumption and assignment of such executory contract or unexpired lease at any time before the Sale Hearing.

50.    Notwithstanding anything to the contrary herein, through the date of closing, the Debtors, the Purchaser or the Successful Bidder, as the case may be, shall have the right to exclude from the Purchased Assets any of the Assumed Contracts and Leases, and in such case any such excluded Assumed Contract or Lease shall constitute an Excluded Asset and shall not constitute, for any purpose whatsoever, an Acquired Asset to be purchased and shall have the right to include any executory contract and/or unexpired lease and, in such case any such included executory contract and/or unexpired lease shall constitute an Asset to be purchased.  Neither the Purchaser nor the Successful Bidder shall incur any liability, obligation, or debt in connection with or related to such Excluded Assets.

51.    To the extent that a non-debtor counterparty to an Assumed Contract or Lease was not provided with a Cure Notice (any such contract or lease a "Previously

Omitted Contract"), the Debtors will notify the Successful Bidder within three (3) business days of the omission. The Debtors shall serve a notice (the "Previously Omitted Contract Notice") to the counterparties to the Previously Omitted Contract indicating the Debtors' intent to assume and assign the Previously Omitted Contract. The counterparties will have fourteen (14) days to object to the Cure Amount or the assumption. If the parties cannot agree on a resolution, the Debtors will seek an expedited hearing before the Court to determine the Cure Amount and approve the assumption. If there is no objection, then the counterparties will be deemed to have consented to the assumption and assignment and the Cure Amount, and such assumption and assignment and the Cure Amount shall be deemed approved by the Sale Order without further order of this Court.

### D.       Request to Set a Date for the Sale Hearing

52.      The Debtors intend to present the APA or the Successful Bid and the Back-up Bid, as the case may be, for approval by the Court pursuant to the provisions of sections 105, 363 and 365 of the Bankruptcy Code at the Sale Hearing to be scheduled by the Court. The Debtors respectfully request that any such Sale Hearing be scheduled on or about January 19, 2016. Upon the failure to consummate a sale of the Purchased Assets after the Sale Hearing because of the occurrence of a breach or default under the terms of the APA or Successful Bid, as the case may be, or the non-approval of this Court, the next highest or otherwise best Back-Up Bid, if any, as disclosed at the Sale Hearing, shall be deemed the Successful Bid without further order of the Court, and the parties shall be authorized to consummate the transaction contemplated by the Back-Up Bid.

53.     The Debtors further request, pursuant to Bankruptcy Rule 9014, that any and all objections to the relief to be considered at the Sale Hearing be filed seven days prior to the Sale Hearing.

**E.      Sale Free and Clear of Liens and Claims**

54.     The Debtors have agreed, and therefore request that the Court hold, that upon Closing the conveyance of the Debtors' interest in the Purchased Assets in accordance with the APA will be a legal, valid, and effective transfer of such Assets, and, to the fullest extent permitted by sections 105, 363(f) and 365 of the Bankruptcy Code, or other applicable law, vests or will vest the Purchaser with all right, title, and interest of the Debtors in and to the Purchased Assets free and clear of Encumbrances and Interests (except the Assumed Liabilities identified in the Term Sheet).

55.     All Encumbrances and Interests of any kind or nature whatsoever will attach to the proceeds of the Sale (the "Proceeds") with the same force, validity, priority and effect, if any, as the Encumbrances and Interests formerly had against the Purchased Assets, if any, subject to the Debtors' ability to challenge the extent, validity, priority and effect of the Encumbrances and Interests.

**Basis for Relief**

**A.      The Sale of the Purchased Assets Is a Product of the Debtors' Reasonable Business Judgment**

56.     Section 363(b)(1) of the Bankruptcy Code provides: "[t]he Trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 365(b).  Section 105(a) of the Bankruptcy Code provides in relevant part: "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

57.    Virtually all courts have held that approval of a proposed sale of assets of a debtor under section 363 of the Bankruptcy Code outside the ordinary course of business and prior to the confirmation of a plan of reorganization is appropriate if a court finds that the transaction represents a reasonable business judgment on the part of the debtor.  See In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986); see also In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991) (holding that the following non-exclusive list of factors may be considered by a court in determining whether there is a sound business purpose for an asset sale: "the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the likelihood that a plan of reorganization will be proposed and confirmed in the near future; the effect of the proposed disposition of the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the property; and whether the asset is decreasing or increasing in value"); Vecchio v. Stroud Ford, Inc. (In re Stroud Ford, Inc.), 205 B.R. 722 (Bankr. M.D. Pa. 1996); Titusville Country Club v. Pennbank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); In re Indus. Valley Refrigeration & Air Conditioning Supplies, Inc., 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063 (2d Cir. 1983); Stephens Indus., Inc. v. McClung, 789 F.2d 386, 391 (6th Cir. 1986); In re Ionosphere Clubs, Inc., 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a section 363 sale in a chapter 11 case are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith").

58.     The "sound business reason" test requires a debtor to establish four elements in order to justify the sale or lease of property outside the ordinary course of business, namely: (1) that a sound business purpose justifies the sale of assets outside the ordinary course of business; (2) that accurate and reasonable notice has been provided to interested persons; (3) that the debtor has obtained a fair and reasonable price; and (4) good faith.  See generally Abbotts Dairies, 788 F.2d 143; see also Titusville Country Club, 128 B.R. at 399; In re Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); Phoenix Steel Corp., 82 B.R. at 335-36; see also Stephens Indus., 789 F.2d at 390; Lionel, 722 F.2d at 1071.  A debtor's showing of a sound business purpose need not be unduly exhaustive, but rather a debtor is "simply required to justify the proposed disposition with sound business reasons."  In re Baldwin United Corp., 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).  Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case.  Lionel, 722 F.2d at 1071.

59.     Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code.  Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper.  In re Fesco Plastics Corp., 996 F.2d 152, 154 (7th Cir. 1993); Pincus v. Graduate Loan Ctr. (In re Pincus), 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002).  Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of the debtor's assets.  See, e.g., Chinichian v. Campolongo (In re Chinichian), 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court

to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); In re Cooper Props. Liquidating Trust, Inc., 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that the bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws").

60.    The proposed procedures for, and the sale of the Debtors' interests in the Purchased Assets, meet the "sound business reason" test.  First, sound business purposes justify the sale.  The Debtors believes that a prompt sale of the Purchased Assets conducted pursuant to the Bidding Procedures presents the best opportunity to realize the maximum value of the Purchased Assets for distribution to the Debtors' estates and the Debtors' creditors.  For instance, if the APA is approved by this Court, most of the Debtors' first tier secured debt will either be paid in full from the sale proceeds or credit bid towards the purchase price for the Debtors' assets.  The Debtors further believe that the benefit to its creditors will be adversely affected absent an immediate sale, as the Term Sheet and impending APA represent greater consideration than the Debtors believe they could attain if they were required to liquidate their assets.  See Lionel, 722 F.2d at 1071 (noting that of the factors a court must evaluate on motion under section 363(b), "most important perhaps, [is] whether the asset is increasing or decreasing in value").

61.    The Bidding Procedures are also justified by sound business purposes. The Bidding Procedures are designed to maximize the value received for the Purchased Assets.  The procedures proposed herein allows for a timely and efficient auction process, while satisfying the various notice requirements of the Bankruptcy Rules and providing sufficient time for parties-in-interest to submit objections to the proposed sale and for

bidders to formulate and submit competing proposals.  Finally, the Bidding Procedures satisfy the good faith requirement of <u>Abbotts Dairies</u>.

62.     The Debtors believe it is in the best interests of their estates, creditors, customers and employees to commence a bidding process immediately, as the Debtors have limited funding and resources to maximize the value of their assets.  It is unlikely that the Debtors will be able to continue operating beyond the period of this proposed bidding process without additional funding, the source of which would be uncertain.  The Debtors have limited production operations and urgent cash needs.  The DIP Facility provides for enough funding to allow the Debtors to continue their production operations, but the funding is limited and will expire by January 19, 2016.  The purchase of raw materials and ongoing production operations, combined with a sale of the Debtors' assets, will help restore confidence with those parties the Debtors have done business with in the past.  For these reasons, the Debtors have determined, based on their business judgment, that the best way to maximize the value of their estates for the benefit of their creditors, customers, employees and other parties in interest is through the immediate marketing and sale of the Purchased Assets pursuant to the Bidding Procedures.

63.     The implementation of competitive bidding procedures to facilitate the sale of a debtor's assets outside of the ordinary course of a debtor's business is routinely approved by bankruptcy courts as a means of ensuring that such sale will generate the highest and best return for a debtor's estate.  The Debtors submit that the opportunity for competitive bidding embodied in the Bidding Procedures will generate the highest or otherwise best offer for the Purchased Assets.

64.    The Debtors believe that a prompt sale process is the best way to maximize the value of the Debtors' assets for the benefit of their estates, creditors and other stakeholders.    The proposed Bidding Procedures described herein are fair, reasonable, and appropriate and are designed to maximize recovery with respect to the sale of the Purchased Assets.

65.    As set forth above, the Debtors have demonstrated compelling and sound business justifications for the sale of the Purchased Assets pursuant to the Bidding Procedures.    The Debtors therefore request that the Court approve the proposed procedures for sale of the Purchased Assets to the highest or otherwise best bidder at the Auction and approve the Sale presented to the Court at the Sale Hearing and authorize the Debtors to take such other steps as are necessary to consummate the Sale.

**B.    The Bid Protections Requested Herein Are Reasonable and Should be Approved**

66.    Local Rule 6004-1 provides that a bidding procedures motion must highlight "[a]ny provision providing an initial or 'stalking horse' bidder a form of bid protection."    Del. Bankr. L.R. 6004-1(c)(i)(C).    As indicated above, the Purchaser requested and the Debtors agreed to reimburse the Purchaser for its reasonable costs and expenses, including reasonable attorneys' fees, up to $250,000, and a Break-Up Fee of $550,000, in the event that the Purchaser is not the successful bidder at the auction.

67.    The Debtors have formulated a bidding process that the Debtors believe will induce prospective competing bidders to expend the time, energy and resources necessary to submit a bid, and which the Debtors believe is fair and reasonable and provides a benefit to the Debtors' estates and creditors.    The Bidding Procedures and, in

particular, the proposed Bid Protections are reasonable and supported by applicable case law.

68.     The use of bid protections such as the Break-Up Fee and Expense Reimbursement have become an established practice in chapter 11 asset sales because such bid protections enable a debtor to ensure a sale to a contractually committed bidder at a price the debtor believes is fair, while providing the debtor with the potential of obtaining an enhanced recovery through an auction process.  Historically, bankruptcy courts have approved bidding incentives solely by reference to the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment.  See, e.g., In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (holding that bidding incentives may "be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted); see also Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 657-58 (S.D.N.Y. 1992).

69.     The Third Circuit has clarified the standard for determining the appropriateness of bidding incentives in the bankruptcy context.  In Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527 (3d Cir. 1999), the Third Circuit held that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions in section 503(b) of the Bankruptcy Code govern in the bankruptcy context. Thus, to be approved, bidding incentives must provide benefit to a debtor's estate.  Id. at 533.

70.    O'Brien identified at least two instances in which bidding incentives may provide a benefit to the estate.  First, a benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Id. at 537. Second, where the availability of bidding incentives induced a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Id.

71.    Moreover, in O'Brien, the Third Circuit referred to nine factors that the bankruptcy court viewed as relevant in deciding whether to award a break-up fee and expense reimbursement: (1) the presence of self-dealing or manipulation in negotiating the break-up fee and expense reimbursement; (2) whether the fee harms, rather than encourages, bidding; (3) the reasonableness of the break-up fee and expense reimbursement relative to the purchase price; (4) whether the "unsuccessful bidder place[d] the estate property in a sales configuration mode to attract other bidders to the auction"; (5) the ability of the request for a break-up fee and expense reimbursement "to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders"; (6) the correlation of the fee to a maximization of value of the debtor's estate; (7) the support of the principal secured creditors and other official committees; (8) the benefits of the safeguards to the debtor's estate; and (9) the "substantial adverse impact on unsecured creditors, where such creditors are in opposition to the break-up fee." See O'Brien, 181 F.3d at 536.

72.     The Debtors submit that the foregoing factors are met under the facts and circumstances of these cases, as the proposed Bid Protections are necessary to the success of the auction and sale process and therefore provide an actual benefit to the Debtors' estate.  The Term Sheet and Bid Protections are the result of arms'-length, good faith negotiation between the parties and their advisors.  The Purchaser was unwilling to enter into the Term Sheet without the protections afforded by the Bid Protections, and the auction contemplated by the Bidding Procedures is designed to initiate an overbid process at a floor price that is desirable for the Debtors, thereby increasing the likelihood that the purchase price will represent the true worth of the Purchased Assets.  The Debtors believe that the amount of such fees will be a fair and reasonable percentage of the proposed purchase price and not chill competitive bidding.

73.     By ensuring a "floor" purchase price under the Term Sheet, the Bid Protections induced the Purchaser to submit a bid that the Debtors believe will induce bids that potentially may have never been made and without which bidding may be limited.  Further, the Expense Reimbursement was and is a material inducement for and condition of the Purchaser's offer to acquire the Purchased Assets.   The Debtors understand that the Purchaser is unwilling to commit to hold open its offer absent such protection.

74.     Moreover, payment of the Bid Protections will not diminish the assets of the estates available for distribution to creditors, employees and customers.  The Debtors do not intend to walk away from the Term Sheet and impending APA, unless to accept an alternative and better bid, which bid must exceed the consideration offered by the Purchaser by an amount sufficient to pay the Bid Protections.

75.     In sum, the Bid Protections provided for in the Term Sheet are the product of arms'-length negotiations between the Debtors on one side and the Purchaser on the other.  The Bid Protections proposed by the Debtors are consistent with the "business judgment rule" and satisfy the "administrative expense" standard espoused in O'Brien. The Bid Protections should therefore be approved.

**C.      The Purchaser Should be Granted the Protection of Bankruptcy Code Section 363(m)**

76.     The Debtors request the Court to find that the Purchaser is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the Sale.

77.     Specifically, Bankruptcy Code section 363(m) provides that:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal.

78.     While the Bankruptcy Code does not define "good faith," the Third Circuit in Abbotts Dairies held that:

> [t]he requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders

or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted); see generally Marin v. Coated Sales, Inc., (In re Coated Sales, Inc.), 1990 WL 212899 (S.D.N.Y. Dec. 13, 1990) (holding that party must demonstrate "fraud, collusion, or an attempt to take grossly unfair advantage of other bidders" to show lack of good faith); see also In re Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (examining facts of each case, concentrating on "integrity of [an actor's] conduct during the sale proceedings") (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)).

79.    As the Debtors will demonstrate at the Sale Hearing, the Debtors have spent a considerable amount of time and resources negotiating the Term Sheet and impending APA in good faith and at arm's length, with give and take on both sides. Under the circumstances, the Purchaser is entitled to all of the protections of Bankruptcy Code section 363(m).

**E.    The Sale of the Debtors' Assets Should Be Free and Clear of Liens and Claims Pursuant to Section 363(f) of the Bankruptcy Code**

80.    Pursuant to, and to the fullest extent permitted by, section 363(f) of the Bankruptcy Code, the Debtors seek authority to sell and transfer the Debtors' right, interest and title in the Purchased Assets to the Purchaser or Successful Bidder free and clear of all liens, claims, encumbrances and other interests, except as set forth in the Term Sheet and APA, with such liens, claims, encumbrances and other interests to attach to the Proceeds of the Sale, subject to any rights and defenses of the Debtors and other parties-in-interest with respect thereto.  Under section 363(f) of the Bankruptcy Code, a debtor may sell all or part of its property free and clear of any and all liens, claims, encumbrances, or interests in such property if: (i) such a sale is permitted under

applicable non-bankruptcy law; (ii) the party asserting such a lien, claim, or interest consents to such sale; (iii) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (iv) the interest is the subject of a bona fide dispute; or (v) the party asserting the lien, claim, or interest could be compelled, in a legal or equitable proceeding, to accept monetary satisfaction for such interest.  11 U.S.C. § 363(f); see also Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (holding that section 363(f) is written in the disjunctive and that a court may approve a sale "free and clear" provided at least one of the requirements is met).

81.    With respect to each creditor asserting an Encumbrance and Interest, the Debtors believe that one or more of the standards set forth in Bankruptcy Code section 363(f)(1)-(5) has been satisfied.  In particular, the Debtors are advised by the Purchaser that each of the Prepetition Lien Holders has consented to the sale and transfer of the Purchased Assets pursuant to the APA.

82.    A sale free and clear of Encumbrances and Interests is necessary to maximize the value of the Purchased Assets.  The Purchaser would not have entered into the Term Sheet and would not consummate the Sale absent the ability to purchase the Purchased Assets free and clear of all Encumbrances and Interests.  A sale of the Purchased Assets other than one free and clear of all Encumbrances and Interests would yield substantially less value for the Debtors' estates, with less certainty than the transaction proposed by the Term SHeet.  Thus, the Sale contemplated by the Term Sheet and impending APA is in the best interests of the Debtors, their estates and creditors, and all other parties-in-interest.

83.    Moreover, Courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically covered by section 363(f).  See, e.g., In re Trans World Airlines, Inc., 2001 WL 1820325 at *3, 6 (Bankr. D. Del. March 27, 2001); Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987).  Approving the Sale free and clear of all adverse interests is warranted.

**F.    The Assumption and Assignment of the Assumed Contracts and Leases Should Be Authorized**

84.    Under Bankruptcy Code section 365(a), a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  The standard governing court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports such assumption or rejection.  See, e.g., In re Stable Mews Assoc., 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984).  If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract.   See Group of Institutional Investors v. Chicago M. St., P. & P.R.R. Co., 318 U.S. 523 (1943); Sharon Steel, 872 F.2d at 39-40.

85.    The business judgment test "requires only that the trustee demonstrate that [assumption or] rejection of the contract will benefit the estate."   Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting Stable Mews, 41 B.R. at 596).  Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory

contract or lease, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default.  11 U.S.C. § 365(b)(1).

86.     The debtor may elect to assign a properly assumed executory contract or lease if adequate assurance of future performance is provided.  11 U.S.C. 365(f)(2); <u>see</u> <u>L.R.S.C. v. Rickel Home Centers, Inc. (In re Rickel Home Centers, Inc.)</u>, 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); <u>Leonard v. General Motors Corp. (In re Headquarters Dodge, Inc.)</u>, 13 F.3d 674, 682 (3d Cir. 1994) (noting that the purpose of section 365(f) is to assist a trustee in realizing the full value of the debtor's assets).

87.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."   <u>EBG Midtown S. Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.)</u>, 139 B.R. 585, 593 (S.D.N.Y. 1992); <u>see also</u> <u>In re Prime Motor Inns Inc.</u>, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994); <u>Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)</u>, 103 B.R. 524, 538 (Bankr. D.N.J. 1988).  Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. <u>See</u>, <u>e.g.</u>, <u>In re Bygaph, Inc.</u>, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

88.     To the extent any defaults exist under any Assumed Contract or Lease, any such default will be promptly cured or adequate assurance that such default will be cured

will be provided prior to the assumption and assignment.  If necessary, the Debtors will submit facts prior to or at the Sale Hearing to show the financial credibility of the Purchaser or Successful Bidder, as the case may be, and willingness and ability to perform under the Assumed Contracts and Leases.  The Sale Hearing will therefore provide the Court and other interested parties the opportunity to evaluate and, if necessary, challenge the ability of the Purchaser or Successful Bidder, as the case may be, to provide adequate assurance of future performance under the Assumed Contracts and Leases, as required under section 365(b)(1)(C) of the Bankruptcy Code.

89.    In addition, the Debtors submit that it is an exercise of its sound business judgment to assume and assign, as the case may be, the Assumed Contracts and Leases to the Purchaser or Successful Bidder, as the case may be, in connection with the consummation of the Sale, and that the assumption and assignment of the Assumed Contracts and Leases is in the best interests of the Debtors, their estate, their creditors, and all parties-in-interest.  The Assumed Contracts and Leases being assigned to the Purchaser (or Successful Bidder) are an integral part of the Purchased Assets being acquired by the Purchaser (or Successful Bidder), and such assumption and assignment is reasonable and will enhance the value of the Debtors' estates.  The Court should therefore authorize the Debtors to assume and assign the Assumed Contracts and Leases.

90.    The Debtors further submit that the Assumption and Assignment Procedures, including the form of Cure Notice attached as <u>Exhibit III</u> to the Bidding Procedures Order, are appropriate and reasonably tailored to provide counterparties to the Assumed Contracts and Leases with adequate notice of the proposed assumption and assignment as well as proposed Cure Costs, if any.   The Debtors believe that

implementation of the Assumption and Assignment Procedures is appropriate under the circumstances and should be approved.

### G.    Waiver of Automatic Fourteen-Day Stay Under Bankruptcy Rules 6004(h) and 6006(d)

91.    Pursuant to Bankruptcy Rule 6004(h), unless the Court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for fourteen days after entry of the order.   Similarly, under Bankruptcy Rule 6006(d), unless the Court orders otherwise, all orders authorizing the assignment of contracts or unexpired leases are automatically stayed for fourteen days after entry of the order.   The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented.   See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h); Advisory Committee Notes to Fed. R. Bankr. P. 6006(d).

92.    Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, commentators agree that the fourteen-day stay period should be eliminated to allow a sale or other transaction to close immediately where there has been no objection to the procedure.   See generally 10 Collier on Bankruptcy ¶ 6004.09 (15th ed. 1999).   Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal.   Id.

93.    Because of the potentially diminishing value of the Purchased Assets, the Debtors need the flexibility to close this sale promptly after all closing conditions have

been met or waived.  The Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## **Notice**

94.    Notice of this Motion shall be provided to: (i) the Office of the United States Trustee; (ii) counsel for the Purchaser; (iii) counsel for any official committee appointed in this case; (iv) all individuals or entities that have asserted a lien or interest in the Debtors' assets; (v) the top thirty (30) creditors of the Debtors and entities known to have asserted any Encumbrances and Interests in or upon any of the Purchased Assets; (vii) all federal, state, county and local and foreign regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion; (viii) all counterparties to the Assumed Contracts and Leases; (ix) the United States Attorney's office; (x) the Internal Revenue Service; (xi) all parties to any litigation involving the Debtor; and (xii) all entities filing notices of appearance or requests for notice under Bankruptcy Rule 2002 in this Bankruptcy Case.  The Debtors respectfully submit that no other or further notice need be provided.

## **No Prior Request**

95.    No prior request for the relief sought herein has been made to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

**<u>Conclusion</u>**

WHEREFORE, the Debtors respectfully request that this Court (i) grant this

Motion and the relief requested herein; (ii) enter the proposed orders attached hereto; and

(iii) grant such other relief as it deems just and proper.

Dated: December 2, 2015
      Wilmington, Delaware          BAYARD, P.A.

                               */s/ Justin R. Alberto*
                               Scott D. Cousins (No. 3079)
                               Justin R. Alberto (No. 5126)
                               222 Delaware Avenue, Suite 900
                               Wilmington, Delaware 19801
                               Phone: (302) 655-5000
                               Facsimile: (302) 658-6395
                               Email: scousins@bayardlaw.com
                                         jalberto@bayardlaw.com

                               *Proposed Attorneys for Debtors*
                               *and Debtors-in-Possession*