## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Axion International, Inc., *et al.*,[1] | ) | Case No. 15-12415 (CSS) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Ref.: Docket Nos. 10 & 11** |
| | ) | **Objection Deadline: Dec. 23, 2015 @ 4:00pm** |
| | ) | **(extended by consent of the Debtors)** |
| | ) | **Hearing Date: Dec. 29, 2015 @ 10:00am** |

### OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO RELIEF SOUGHT IN DEBTORS' MOTION FOR DIP FINANCING (D.I. 10) AND DEBTORS' SALE MOTION (D.I. 11)

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 cases (the "Chapter 11 Cases") of the above-captioned debtors-in-possession (the "Debtors") submits this objection (the "Objection") to: the *Motion of Debtors for (I) Authorization To (A) Obtain Secured DIP Facility Pursuant To 11 U.S.C. §§ 361, 362, And 364(c) And (d), (B) Grant Security Interests, Superpriority Claims And Adequate Protection And (C) And Use Cash Collateral; And (II) Schedule A Final Hearing Pursuant To Bankruptcy Rule 4001(c)* (the "DIP Motion") (Docket No. 10) and *Debtors' Motion For Orders (I)(A) Authorizing And Approving The Bidding Procedures, (B) Approving Certain Notice Procedures, (C) Approving The Assumption And Assignment Procedures, and (D) Setting A Date For The Sale Hearing And (II) Authorizing And Approving (A) The Sale Of The Debtors' Assets, and (B) The Assumption And Assignment Of Certain Contracts And Leases* (the "Sale Motion") (Docket No. 11). In support of this Objection, the Committee respectfully states as follows:

---

[1] The Debtors are Axion International, Inc., Axion International Holdings, Inc., and Axion Recycled Plastics Incorporated.

8241649/

**Preliminary Statement**

1.      The Debtors, at the first day motion hearing (the "First Day Hearing"), proposed a sale of substantially all of the Debtors' assets, to an insider, for a credit bid based on a dubious lien, which sale produces no tangible benefit for any constituency of the estate other than the insider himself and management. In addition, the proposed sale is being conducted on a rapid time frame over the holiday season in an attempt to deprive creditors of an opportunity to investigate whether the sale is appropriate and whether a superior alternative is available.

2.      In order to ensure that this dubious scheme goes through, the Debtors have proposed debtor-in-possession financing ("DIP Financing") controlled by the very same insider and a set of bid procedures (the "Bid Procedures") that work hand in glove in order to both chill other bidders from entering the sale process and prevent the Committee from having the time and resources necessary to investigate the liens and the sale process and proffer an alternative.  Although there is no emergency or "melting ice cube" here, a false emergency is created by the DIP Financing deadlines, which financing is proposed by an entity affiliated with the very same insider who purports to buy the company for minimal cash consideration.

3.      There should be no question that the proposed sale and bidding procedures provide no benefit whatsoever to the Debtors' Estates.  The only party who is "paid" from the sale is the insider, Allen Kronstadt ("Kronstadt"), a portion of whose debt is assumed by himself as the stalking horse.  A senior secured creditor, Community Bank, who has a superior lien to the stalking horse insider's position, is not being paid in full

and objects to the sale.[2] The unsecured creditors and equity receive no benefit at all from the sale. Indeed, given that the proposed sale includes transferring the right to pursue Chapter 5 avoidance actions and causes of action against the very management who have so terribly mismanaged these Debtors, the unsecured creditors are likely getting less through this sale process than they would in a liquidation where tangible assets are sold and the estate could pursue the causes of action.

4.     Unfortunately, the DIP deadlines and sale procedures do not afford the Committee the time to investigate whether a sale as a going concern is in the best interests of creditors.  Management's rationale for railroading the creditors over the holidays into this insider deal that provides no benefit to the Debtors' estates is set forth in the Fallon Declaration filed with the first day motions (Docket No. 3).  Although Mr. Fallon goes on for twenty nine (29) pages, the rationale all boils down to one assertion: the Debtors have conducted a "robust" sale process, and after engaging hundreds of potential purchasers, this insider deal is the only game in town.

5.     The problem with this is that the Debtors own investment banker whose efforts Mr. Fallon extols in minute detail in his Declaration has said that there was not a "fulsome" marketing process. *See Gordian Group Objection to Bidding Procedures and DIP Financing* (Docket No. 63).

6.     The proposed sale simply does not provide any real or tangible benefit to the unsecured creditors in these cases. Furthermore, the sale disposes of substantially all of the Debtors' assets without the protection of a confirmable and feasible plan of reorganization or liquidation.  The Committee believes that if a sale of substantially all of the assets is to occur in this case, then the sale must provide the protections of section

---

[2] *See Community Bank's Objection to the DIP Financing Motion* (Docket No. 61).

8241649/

1129 of the Bankruptcy Code and be done in the context of a plan or section 363 sale process which is developed through meaningful negotiations with the Committee after it has had an opportunity to investigate both this sale and alternatives. Finally, any sale or plan must provide some real value to the unsecured creditors.

7.      Accordingly, as outlined below, the Committee objects to the proposed sale, Bid Procedures, and the debtor-in-possession financing as currently proposed by the Debtors. The Committee, only recently appointed in these Chapter 11 Cases, is in the process of investigating the Debtors' prepetition capital structure and transactions apparently designed solely to benefit insider, Kronstadt and entrenched management to the detriment of the unsecured creditors.

8.      Despite his status as a significant equity holder, noteholder, his board affiliations, and now as a "lender," Kronstadt, on his own and through his various affiliations and designees (collectively, the "Insider Bidder"), seeks to impose an expedited, controlled and unfair sale process riddled with roadblocks and barriers to non-insiders. Part of this sale process appears to include perks and protections for the Insider Bidder in the event that he does not prevail at auction through unreasonable fees and other benefits in the form of the Bid Procedures and DIP Financing.

9.      The Debtors selected the Insider Bidder as their stalking horse without fully vetting the process to non-insider prospective purchasers of the Debtors' assets prior to the Petition Date. The Debtors now ask the Court to approve their conduct without sufficient due diligence prior to selecting the Insider Bidder and entering into the proposed asset purchase agreement (the "Insider APA") (Docket No. 56).

10.    Through the combination of a debtor-in-possession financing facility (the "DIP Facility" or "DIP Financing") and the Bid Procedures, Kronstadt and the Debtors have orchestrated a scheme designed to protect Kronstadt and his investment in the Debtors at the expense of unsecured creditors by hindering the Committee's investigation rights, chilling other parties from entering the sale process, ramming through a going concern sale before the creditors can even determine whether that is in the estates' best interest, and generally preventing the Debtors from realizing maximum value for the businesses.

11.    Certain key provisions of the DIP Financing and Bid Procedures improperly benefit the Insider Bidder to the disadvantage of the Debtors' estates as a whole.  For example,

12.    First, the proposed Bid Procedures significantly limit prospective bidders' ability to conduct due diligence, especially for prospective bidders who are not yet involved in the process or who recently became involved in the process. While Kronstadt, as an insider, already knew the Debtors and has not made a deposit or provided a financial statement, a new bidder must first provide financial information and a payment to get due diligence, and then must conduct his due diligence over the holidays on an extremely compressed time frame.   The Committee requires additional time to investigate, at first blush, the Debtors have not provided a feasible business plan or forward-looking projection, both of which are necessary elements to any sale process.

13.    Second, despite the Committee's requests, the Debtors have refused to extend the sale deadlines.  Extension of the sale-related deadlines will enable the Debtors, with the Committee's input, to conduct a robust sale process, which it does not appear to

have done to date, and, for the first time, consider alternatives to the current proposal for sale as a going concern.  Moreover, this proposed sale, which relies on the validity of Kronstadt's alleged position as secured with respect to certain 2012 Convertible Notes, cannot be approved until the Committee completes its investigation, and the Court has already allowed until February 1, 2016 for it to do so.

14.    Third, certain provisions of the Bid Procedures improperly benefit the Insider Bidder to the significant disadvantage of the Debtors' estates as a whole. These include, *e.g.*,: (a) an egregious breakup fee and expense reimbursement, proposed to be a whopping 25% of Kronstadt's non-cash bid; and (b) the enabling of the Insider Bidder to credit bid its questionable "debt" for what appear to be unencumbered assets that are *not* subject to Kronstadt's alleged liens, proceeding as though there were no need to distinguish between the assets.  Relatedly, the proposed DIP Facility seeks to encumber all previously unencumbered assets, including for example, all chapter 5 causes of action and the proceeds thereof, and to obtain additional protections.  Absent the proposed sale, unsecured creditors could look to the Debtors' unencumbered assets as a potentially meaningful source of recovery.  The Bid Procedures and proposed Insider Bidder's credit bid do not allocate any value for the unencumbered assets for the benefit of unsecured creditors.

15.    Fourth, the Insider Bidder should not be entitled to any bidding protections because it is not necessary to induce a bid from party who improperly attempted to convert a significant equity ownership interest in the Debtors to security, especially until such time as the level of interest from non-insider parties is seriously explored to permit the opportunity to make a bid.  The Insider Bidder should not be permitted its fees and

8241649/

expenses for any bid.  Any break-up fee and is unnecessary given the Insider Bidder's multi-year involvement and deep knowledge and control of the Debtors.

16.     Fifth, the proposed DIP Financing works hand in glove with the Bidding Procedures to make sure that only Kronstadt can prevail. For example, if Kronstadt is not the prevailing bidder at the proposed auction, the DIP Financing immediately terminates *before the prevailing bidder can get into Court to have takeout lending approved.*  No one can be expected to bid on this company knowing that the minute they prevail, the Debtors' operations will cease due to lack of funding.

## Background

17.     The Debtors are Axion International Holdings, Inc. ("Holdings"), a Colorado corporation and a publicly-held holding company; Axion International, Inc. ("Axion"), a Delaware corporation and an operating company that is wholly-owned by Holdings; and Axion Recycled Plastics Incorporated ("Recycled"), an operating company incorporated in Ohio that is wholly-owned by Axion.

18.     Holdings, Axion and Recycled (collectively, the "Debtors") filed voluntary chapter 11 bankruptcy petitions in this Court on December 2, 2015, and continue to manage their businesses as debtors-in-possession.   Pursuant to an order of this Court, the cases are being jointly administered.

19.     On December 14, 2015, the Office of the United States Trustee ("UST") appointed an Official Committee of Unsecured Creditors (the "Committee") to represent the interests of unsecured creditors in this bankruptcy case.[3]

---

[3]  The Committee members are the following: (i) Addax Trading LLC; (ii) Coyote Logistics; and (iii) Sicut Enterprises, Ltd.

8241649/

20.     Kronstadt is a businessman and investor, based in Rockville, Maryland. He is the principal of A.R. Kronstadt Realty Investors, Inc., a firm focused on developing and managing retail, industrial and indoor sports facilities.

A.     The Debtors' Business

21.     Recycled and Axion are in the business of manufacturing and selling railroad ties, construction mats, and other building materials from recycled plastics and operate from leased manufacturing facilities in Zanesville, Ohio and Waco, Texas. Upon information and belief, Axion produces railroad ties in Waco, Texas, while Recycled produces construction mats in its Zanesville, Ohio location.

22.     The processes used to manufacture the Debtors' products are based on technology developed by Rutgers University.  The Debtors' use of the technology is made possible through an exclusive, royalty-bearing license agreement the Debtors have with Rutgers. Rutgers attempted to terminate the license pre-petition and asserts that Debtors are in both monetary and nonmonetary default, and that, therefore, the license cannot be assumed and assigned. *See Limited Objection of Rutgers, The State University of New Jersey to Debtors' Sale Motion* (Docket No. 59). This raises a question whether the Debtors can even be sold as a going concern, and whether an auction would be fruitless.

23.     As set forth in SEC Form 10-Ks filed by Holdings, Axion commenced operating in 2007.[4]  In March 2008, a merger was completed through which another company (Analytic Surveys, Inc.) changed its name to Axion International Holdings,

_____

[4] Holdings' SEC filings are the source for a number of the facts cited herein.

Inc., and Axion became a wholly-owned subsidiary of Holdings.    In late 2010, Holdings

and Axion began the sales and marketing of their products.[5]

24.    In 2013, Holdings and Axion created Recycled, as a subsidiary of Axion,

for the purpose of acquiring the assets of an existing plastics recycling plant in

Zanesville, Ohio.[6]  In or about November 2013, Recycled began operating at the facility,

under an assumed lease.    The Zanesville, Ohio, facility also allegedly became corporate

headquarters for the Debtors.

25.    In or about September 2013, Axion entered into a lease of the production

facility in Waco, Texas.[7] The Waco lease was with Coll Financial Holdings, LLC, as

lessor.[8]

1.    In this bankruptcy case, the Debtors disclosed that on May 25, 2014, the

lessor of the Waco facility became Waco Amigos Real Estate LLC ("Waco Amigos").[9]

Kronstadt is a principal of Waco Amigos.[10]

26.    According to the Declaration of Donald W. Fallon in Support of Chapter

11 Petitions and Related Motions (Docket No. 3) (the "First Day Declaration"), as of

September 30, 2015, the Debtors "had a capital deficit of $10,100,000, a stockholders'

deficit of $31,500,000 and accumulated losses of $86,200,000."  First Day Decl., ¶ 18.

---

[5]  *See* Holdings' Form 10-K for the period ending December 31, 2011 and its Form 10-K for the period
ending December 31, 2013 (item 7).

[6]  This information is supplied in Holdings' 2014 Form 10-K for the period ending Dec. 31, 2013.

[7]  *See* Holdings' SEC form 10-K for FY ending Dec. 31, 2013, filed April 2014 (the "2014 10-K"), at F-25.

[8]  *See* Holdings's Form 10-K for FY ending Dec. 31, 2013, filed in April 2014 (the "2014 10-K") identifies
the Lease Agreement dated September, 2013 between Axion International, Inc. (as lessee) and Coll
Financial Holdings, LLC (as lessor) for the facility located at Waco, Texas. *See* 2014 10-K, Ex. 10-30.

[9]  See *Debtors' Motion for an Order Authorizing (I) Entry Into Lease Agreement For Use of Certain
Railroad Track, (II) Entry Into Related Indemnification Agreement, and (III) Granting Related Relief*
(Docket No. 37), ¶ 6.

[10]  Per both the Corporation Wiki website and Bizapedia website,  Kronstadt is one of three principals (or
"governing persons") of Waco Amigos Real Estate. *See* http://www.corporationwiki.com/p/2g4hej/waco-
amigos-real-estate-llc ; http://www.bizapedia.com/tx/WACO-AMIGOS-REAL-ESTATE-LLC.html .
Both websites report that the entity filed as a Texas limited liability company on May 20, 2014.

8241649/

Indeed, in the Committee's discussions with Debtors' management, Debtors have admitted that they have never operated at a profit, that a multi-million dollar cash infusion would be necessary just to break even, and that it costs more to produce each railroad tie than it can be sold for. Again, this raises a serious question whether there is any going concern value here that needs to be captured by a rapid fire insider credit bid sale that produces no value for the estate.

27.    According to the Debtors, it was only in their unaudited Form 10-Q for the quarterly period ending September 30, 2015, filed on November 16, 2015, that the Debtors disclosed that they were unable "to independently survive as a going concern." *Id.* at 10, 18-19.

28.    However, the annual Form 10-K report filed by Holdings on March 31, 2015, for the fiscal year ending December 31, 2014, contains a statement from the Debtors' former certified public accounting firm, BDO USA, Inc.[11] that their "report contains an explanatory paragraph regarding the Company's ability to continue as a going concern." 2015 Form 10-K, pp. 35-36 and Ex. 23.1 (at p. 36: "substantial doubt about our ability to continue as a going concern").

29.    Indeed, for years, the Debtors have been no stranger to deepening insolvency.

30.    The annual SEC form 10-Ks filed by the Debtors for the fiscal years ending December 31, 2014, 2013, 2012, and 2011 *all* reported that the Debtors' independent registered public accountants expressed substantial doubt about the Debtors'

---

[11] On October 13, 2015, the Debtors replaced BDO USA, Inc. with GBQ Partners, LLC.

ability to continue as a going concern.[12]  That's another way of saying the Debtors were most likely insolvent in each of those years.

31.    According to the Debtors, since at least September 2012, the revenues from the business's operations have been insufficient to support their operating obligations, and "the Debtors have relied upon the continued financial contributions from a concentrated group of investors." First Day Decl., ¶ 23.

B.    The Debtors' Principal Business Debt

32.    According to the Debtors, the State of Ohio has a first priority security interest in certain equipment assets of Recycled, on a debt for which the balance owed is $236,201 (the "Ohio Debt").  First Day Decl., ¶11.

33.    The Debtors state that they entered into two term loans with The Community Bank in 2013, in the principal amounts of $1 million and $3.5 million, and that these loans are secured by first priority liens on certain equipment assets of the Debtors (the "Community Debt").  *Id.*, ¶ 12.

34.    Valuations of the assets collateralizing the Ohio Debt and the Community Debt have not been performed.  (The proposed sale to Kronstadt nonetheless proposes to pay $500,000 to these two secured creditors to wipe out their secured liens. Community has rejected this treatment.)

35.    In 2014, the Debtors say, they obtained an unsecured loan of $4 million from EagleBank.  *Id.*, ¶ 14. They further say that the loan was one-third guaranteed by Kronstadt.  Debtors' DIP Financing Motion (D.I. 10), ¶ 18.

---

[12] By way of example, the SEC Form 10-K that Holdings filed on March 6, 2012, for the fiscal year ending December 31, 2011, states:  "Our independent auditors issued an explanatory paragraph expressing substantial doubt about our ability to continue as a going concern on our financial statements for the years ended December 31, 2011 and September 30, 2010 and for the transition period ended December 31, 2010, based on the significant operating losses and a lack of external financing."

8241649/

36.    The Debtors have a few million of debt to professionals, trade creditors, and the like, as indicated in the Debtors' list of their 30 largest unsecured creditors and most recent 10-Q.

37.    For the rest, it appears that the Debtors have had an overwhelming accumulation of obligations to investors, of which some have been characterized as secured notes, some have been characterized as unsecured notes, and some of which were alleged debt convertible to common stock.

38.    Among these obligations to investors were certain 8% convertible notes issued by Holdings on or about August 24, 2012, which collectively were in the original principal amount of $10 million the (the "2012 Convertible Notes").    The 2012 Convertible Notes were collectively issued to three investors or investor groups: Melvin Lenkin, Samuel Rose, and Allen Kronstradt.

39.    The 2012 Convertible Notes purport to be secured. The August 2012 security agreement supporting them was executed only by Holdings and Axion, and not by Recycled (which was not formed until 2013).    At this early juncture, it is unclear to the Committee what assets of Holdings and Axion purportedly secure these notes.[13]    It is, however, clear that the assets of Recycled do not secure the 2012 Convertible Notes.

40.    Although the 2012 Convertible Notes purport to be secured, the notes and security agreement included a broad subordination provision.  The holders of the 2012 Convertible Notes expressly agreed to deliver a subordination agreement in favor of (i) any board-approved asset-based, secured loans with *bona fide* third party financial institutions, and (ii) any equipment financing loans approved by the board.    In other

---

[13] It is also unclear, *inter alia*, whether or when such security interest was perfected; and whether the entire obligation should be recharacterized as equity.

words, the "security interest" was constructed so as not to interfere with the ability of the Debtors to grant first priority security interests in their assets in exchange for operational financing.

C.    Kronstadt And His Investments In The Debtors

41.    It was into this precarious financial footing that Kronstadt began investing in the Debtors, beginning in or about April 2012, and continuing into 2015.  His investments were for both equity (*i.e.*, stock and warrants) and debt; and the debt investments were both secured and unsecured.   In addition, his investments were both in his own name and in the name of family trusts or foundations he established – Danielle Nicole Kronstadt Irrevocable Trust dated 2/26/2001, Jamie Fay Kronstadt Irrevocable Trust dated 2/26/2001 and Michael Benjamin Kronstadt Irrevocable Trust dated 2/26/2001, and Bethesda Foundation, Inc.

42.    Kronstadt joined the board of directors of Holdings effective September 11, 2012 and he remained on the board until, according to the Debtors, he resigned on June 9, 2015.

43.    Upon information and belief, as of March 23, 2015, Kronstadt owned or beneficially controlled 30,156,573 of Holdings' 81,685,119 shares of common stock representing 33.8% of its common stock.  *See* 2015 10-K., p. 49.   In April 2015, Kronstadt tendered the warrants he held and obtained 10.9 million more shares of Holdings' stock. First Day Decl., ¶ 33.  He was also issued 1.9 million more shares, as interest on his convertible notes. *Id.*   With that additional stock, at that time, Kronstadt may have owned or controlled a majority of the common stock of Holdings.

13

44.    Given Kronstadt's accumulation of stock *after* he already owned or controlled 33.8% of Holdings' stock, it is unclear on what basis the Debtors represented that, by October 2015, Kronstadt had only become a 20.1% stockholder.  First Day Decl., ¶ 33.  In any event, he was and is a major and very influential shareholder.

45.    According to the Debtors, through December 31, 2014, Kronstadt had purchased $5.2 million of the Debtors' 2012 Convertible Notes.    First Day Decl. ¶32.

46.    The Debtors describe the 2012 Convertible Notes as "secured," and Kronstadt's interest in them as simply the "Kronstadt Secured Notes."

47.    While the Debtors have yet to explain the nature of the alleged security interest, the bidding procedures assume that Kronstadt has a valid, perfected secured lien on all the assets of all the Debtors.    But as indicated *supra*, that characterization may be misleading since, *inter alia*, (a) Recycled was not a party to the security agreement; (b) the security agreement itself provides for subordination to subsequent asset-based business loans or equipment leases; and (c) as described *infra*, the other investors in the 2012 Convertible Notes, apart from Kronstadt, ultimately treated their interests as valueless, and simply relinquished their interests in them,[14] and (d) the Ohio Debt and the Community Debt still have first priority.

48.    The Debtors have stated that Kronstadt additionally purchased interests in a different set of 8% convertible notes; interests in certain 12% convertible notes; and

---

[14]  In any event, the extent of the alleged security interest will be the subject of investigation by the Committee. Per the Court, the Committee will have until February 1, 2016 to complete that investigation. No credit bidding should be allowed to take place prior to completion of such investigation.

interests in other 12% notes.  First Day Decl., ¶ 32.  None of these interests were backed by a security interest in the business assets of any Debtor.  *See id.*[15]

E.    Events Leading To The Filing Of The Bankruptcy Cases

49.    It is evident that, at some point, Kronstadt began taking actions to orchestrate his own "loan-to-own" strategy.   To that end, Kronstadt needed to own or acquire debt – and in particular, secured debt.  As this Court is aware, following the bankruptcy of an insolvent company, the stock (equity) interests are generally wiped out.

50.    On the other hand, retention of a controlling equity interest as long as possible would allow Kronstadt to control the Debtors, heading into a bankruptcy.

51.    On November 24, 2015, Kronstadt tendered back to the Debtors all the common stock of Holdings that he held in his individual name.  First Day Decl., ¶ 34.  Mr. Fallon is silent on as to how many shares this constituted.  Kronstadt did not, however, relinquish all the common stock in Holdings held by the family trusts and foundation, and he continues to control the shares retained by those entities.  *Id.*

52.    In April 2015, the Debtors retained Gordian Group, LLC ("Gordian") to advise them on potential restructuring, refinancing or sale options.  First Day Decl., ¶ 25.  Gordian was prohibited from adequately marketing the company to ensure maximum value of the Debtors' assets.  Gordian Objection at ¶ 5.

53.    Even the Debtors acknowledge that, while the names of several strategic purchasers "surfaced," the Debtors only had discussions with a single strategic party that they identified themselves.  First Day Decl., ¶ 26.

---

[15] One set of notes was "secured" by Holdings' equity interest in Axion. But where Axion is insolvent, that security has no value.

8241649/

54.    The Debtors terminated Gordian's retention, immediately prior to the bankruptcy filing.  12-4-2015 Tr., p. 5, ln. 2.

55.    According to the Debtors, the "two other investors with whom  Kronstadt invested forgave their debt and relinquished part of their shares in October 2015." First Day Decl., ¶ 33.    The clear implication is that the other two investors in the 2012 Convertible Notes – which, again, were in the original principal total of $10 million – gave up on those investments having concluded that the 2012 Convertible Notes had no appreciable value.

F.    The Proposed Debtor-in-Possession Financing and Kronstadt's Stalking Horse Bid

56.    The Debtors, having spurned investigation into a sale to a strategic non-insider, instead focused on a plan worked out with Kronstadt, whereby Kronstadt would, through a chapter 11 bankruptcy, buy the Debtors' entire business for $500,000 cash, with terms under which the Debtors would also "assume" a $2 million obligation back to Kronstadt, payable over time.

57.    To make the consideration offered by Kronstadt appear more substantial, his proposal purports to use $3.2 million of his stake in the 2012 Convertible Notes to "credit bid" for the Debtors' assets, in conjunction with the $500,000 in cash.    That is, he would credit bid using $3.2 million of his interest in the 2012 Convertible Notes even while the two other investors that purchased those notes in 2012 have relinquished all their interest in those notes – presumably due to their lack of worth.

G.    The DIP Financing

58.    To keep the Debtors operating, albeit on a short string, in the Chapter 11 Cases, Kronstadt arranged for debtor-in-possession financing, through his friend Murray

Koppelman[16], using a limited liability company called Plastic Ties Financing LLC ("Plastic Ties" or the "DIP Lender"), which is purportedly 100% owned by Mr. Koppelman. First Day Decl., ¶ 20. The Debtors entered an agreement prepetition with Plastic Ties, for postpetition financing of up to $2.2 million. First Day Decl., ¶ 20.

59.    Some of the financing – apparently, $350,000 – was actually furnished by Plastic Ties prepetition. *See* 12-4-2015 Tr. at 21, 39. This $350,000 was furnished prepetition, on an apparently unsecured basis, and obviously without court approval. Nonetheless, the terms of the DIP Loan would require this amount to be repaid promptly from the first draw on the DIP Loan, thereby converting it from unsecured debt to secured debt to the detriment of all creditors. (In reference to this $350,000 paid prepetition, at the First Day Hearing, this Court remarked: "Sounds like a gift to me." 12-4-15 Tr. at 21.)

60.    The DIP Financing expires on January 19, and has very tight internal time frames that create defaults if they are not met. This makes it difficult for the Committee to insist on a robust sale process and an opportunity to investigate Kronstadt's liens and investigate other alternatives to this sale. Clearly, the DIP Financing is meant to work together with the Bidding Procedures to insure that Kronstadt emerges as the prevailing bidder.

61.    The timeframe set forth in the DIP Loan requires that the sale, including the credit bid, takes place prior to the end of the Committee's investigation of the prepetition liens. This is little more than a poorly disguised attempt to moot the Committee's investigation and any objections to Kronstadt's liens.

---

[16]    The two of them traveled together to Isfahan, Iran in 2011. http://www.thejewishweek.com/features/lens/friday_night_isfahan.

62.    The DIP Financing has a budget attached to the DIP Financing Motion which sets forth how the Debtors may spend its money. While the Committee is still investigating the budget, it is clear that the budget deliberately fails to provide sufficient funding for the Committee professionals (and actually for all professionals, since, this Court looks at all professional fees as one pot). Again, this is another attempt to hamstring the Committee and prevent it from making a full investigation and exploring alternatives to the sale.

63.    In particular, the DIP Financing prevents the Committee professionals from spending in excess of $25,000 on investigating Kronstadt's behavior and his liens, even though this is the key issue in the case as it is currently postured. Furthermore, the proposed Final DIP Order states that the Committee professionals cannot be reimbursed for any objections to the DIP Financing, including this one. This appears to be more overreaching to benefit Kronstadt.

64.    Like the bid procedures, the DIP Financing includes overly broad releases, exculpations, and indemnification for Kronstadt and his affiliates. No justification for these releases is provided, nor is it clear what he is being released from.

H.    The Proposed Bid Procedures

65.    On the Petition Date, the Debtors filed its motion seeking Court approval of their proposed Bid Procedures. The salient terms of the Bid Procedures include:

- Sale of substantially all of the Debtors' assets, including assets not previously encumbered and valuable causes of action;
- Designation of the Insider bidder as the stalking horse bidder;
- A credit bid by the Insider Bidder;
- A Sale Objection deadline of January 12, 2016;
- A Bid Deadline of January 15, 2016;
- Scheduling of an Auction of January 18, 2016;

- Approval of a Break-Up Fee in the amount of $550,000 to the Insider Bidder;
- Approval of Expense Reimbursement up to $250,000;
- Substantial barriers to entry for other bidders, including a cash deposit and audited financials;
- Bidding increments of $150,000;
- Extensive releases for Kronstadt, his affiliates, agents and employees;
- Very limited protection for parties whose contracts are being assumed; and
- Establishment of other bidding conditions and the failure to include transparency and meaningful Committee participation in the process.

The Bid Procedures do *not* contain a clear indication of the identity of the stalking horse buyer, nor whether or how the buyer came to hold the alleged Kronstadt liens.

## Objections

A.    Evaluation Of the Relief Sought By Debtors

66.    The overriding goal of any proposed asset sale under section 363 of the Bankruptcy Code is to maximize the proceeds received by a debtor's estate. *See Official Comm. of Unsecured Creditors of Cybergenics Corp., v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003). The purpose of the procedural bidding orders is to facilitate an open and fair public sale designed to maximize value of the estate. *See e.g., In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998). To accomplish that goal, bankruptcy courts are necessarily given discretion and latitude in conducting a sale. *See id.; see In re Wintz Co.*, 219 F.3d 807, 812 (8th Cir. 2000) (stating that in structuring a sale of assets, bankruptcy courts "have ample latitude to strike a satisfactory balance between the relevant factors of fairness, finality, integrity, and maximization of assets").

67.    The Bid Procedures and DIP Financing taken as a whole fail to meet the goals of establishing an open and fair bidding process designed to maximize the value for the Debtors' estates. In fact, the proposed Bid Procedures and Insider APA contain

19

provisions that will accomplish the opposite result, namely chill bidding, limit participation of prospective bidders, and result in an overall process that is unfairly slanted in favor of the insider.   The DIP Financing is designed to give the insider unfair advantages, particularly by its unreasonable timetable, and to insure the insider prevails.

B.     The Insider Sale Requires Strict Scrutiny

68.     The Debtors do not deny Kronstadt's status as an insider.  Yet, the Debtors proclaim that the Bid Procedures are reasonable and appropriate and that the sale of the purchased assets is the product of the Debtors' "sound business" judgment.  *See* Sale Motion at ¶60.   However, the evaluation of the Bid Procedures is not governed by the business judgment rule but through the prism of intrinsic fairness and reasonableness. *See re American Safety Razor Company, LLC* (Bankr. D. Del. Sept. 30, 2010) (Case No. 10-12351) (MFW).   Tr. at p. 132, ln. 23 – p. 133, ln. 5 ("I don't think, as the debtors suggest, that my consideration of bid procedures is based on the business judgment rule. I need not accept the debtors' business judgment with respect to process.   The Bankruptcy Code and Rules and the process under the Bankruptcy Code are all matters for the debtor – for the Court's determination as to what is fair and reasonable.  In fact, I think that's my only role in this case:  to determine what is fair for all the parties.").  But even if the Bid Procedures were subject to the business judgment rule, the Debtors too fail this test.

69.     The Bid Procedures require special scrutiny due to the insider status of Kronstadt and his Insider Bidder designee.  The requested approval of the Insider Bidder as the stalking horse bidder does not pass muster under the heightened scrutiny

8241649/

application to transactions involving insiders.    That transaction among debtors and

insiders are subject to a heightened standard of scrutiny is not novel.

70.    The United States Supreme Court and a majority of Circuit Courts agree.

*See Pepper v. Litton*, 308 U.S. 295, 307-08 (1939); *Matter of Lifschultz Fast Freight*, 132

F.3d 339, 344 (7th Cir. 1997) ("Insider's dealings with debtor-corporation are ordinarily

subject to rigorous or strict scrutiny."). *In re Auto Style Plastics, Inc.*, 269 F.3d 726, 745

(6th Cir. 2001); *In re Harford Sands Inc.*, 372 F.3d 637, 641 (4th Cir. 1991); *Fabricators*

*Inc. v. Technical Fabricators, Inc.*, 936 F.2d 1458, 1465 (5th Cir. 1991); *Brewer v. Erwin*

*& Erwin, P.C.*, 942 F.2d 1462, 1465 (9th Cir. 1991); *In re Mid-Town Produce Terminal,*

*Inc.*, 599 F.2d 389, 393 (10th Cir. 1979); *United  Hotels Co. of America v. Mealey*, 147

F.2d 816, 819 (2d Cir. 1945) (acknowledging that New York law has always subjected to

careful scrutiny contracts made by directors having a personal interest); *In re Nugelt*, 142

B.R. 661, 667 (Bankr. D. Del. 1992)("Insider transactions subject to greater scrutiny than

arms' length transactions."); *In re Wingspread Corp.*, 92 B.r. 87, 93 (Bankr. S.D.N.Y.

1988) ("Sales to fiduciaries are necessarily subject to heightened scrutiny because they

are rife with the possibility of abuse."); *Liberty Mutual Insurance Co. v. Leroy Holdings*

*Co., Inc.*, 226 B.R. 746, 755 (N.D.N.Y. 1998) ("The conduct of an insider is subject to

more rigorous scrutiny.").

71.    [I]nsider transactions are subjected to rigorous scrutiny and when

challenged, the burden is on the insider not only to prove good faith of a transaction but

also to show the inherent fairness from the viewpoint of the corporation and those with

interests therein."    *In  re  Papercraft  Corp.*, 211 B.R. 813, 823 (W.D. Pa. 1997)

(explaining how insider transactions are subjected to rigorous scrutiny, requiring a

showing of inherent fairness), *aff'd*, 160 F.3d 982 (3d Cir. 1998); *In re Ultimate Escapes Holdings, LLC*, 12-50849 (BLS), 2014 WL 5861765, at *9 (Bankr. D. Del. Nov. 12, 2014) (entire fairness must be proven where independence of decision making is at risk due to "extraneous consideration or influences"); *In re Enron Corp.*, 335 B.R. 22, 28 (S.D.N.Y. 2005)("Courts have held that transactions that benefit insiders must withstand heightened scrutiny before they can be approved under § 363(b) "are necessarily subjected to heightened scrutiny because they are rife with the possibility of abuse").

72.    More recently, this Court in *Moycorp, Inc.*, distinguished the application of the business judgment rule in and outside of bankruptcy:

> I think that there's a distinction between the implication of the business judgment rule as a defense to a breach-of-fiduciary case where if you prove-up disinterestedness and exercise due care, you can make the worst decision possible and you're still protected.  In bankruptcy court, the debtors come in and seek affirmative relief from the Court for a variety of reasons . . . and they will also need to make, at least, some finding or some record that it's the right call.  You can't blatantly make the wrong decision and satisfy your bankruptcy duty of exercising due care.

*In re Molycorp, Inc.*, Case No. 15-11357 (Bankr. D. Del.), July 22, 2015 Tr. at 68.

73.    Here, the Debtors cannot show that the sale process and DIP Financing is anything but to favor the interests of an insider.  Despite his self-serving bidding, Kronstadt cannot deny that he is an insider of the Debtors.  *See re Washington Mut., Inc.*, 461 B.R. 200, 263 (Bankr. D. Del. 2011) ("Insiders of a corporation are not limited to officers and directors, but may include 'temporary insiders' who have 'entered into a special confidential relationship in the conduct of the business of the enterprise and are given access to information solely for corporate purposes.'" (citing *Dirks v. SEC*, 463 U.S. 646, 655 n. 14 (1983)); *cf. N.J. Carpenters Pension Fund v. info GRP., Inc.*, No. Civ. A 5334-VCN, 2011 WL 4825888, at *11 (Del. Ch. Sept. 30, 2011)(*de facto* control

22

can be found to exist through contact with board of directors sufficient to give rise to fiduciary duties); *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 399 (3d Cir. 2009) (determining that major creditor was non-statutory insider based on findings that creditor had "the ability to coerce [debtor] into a series of transactions that were not in [debtor's] best interests).

74.     Until recently, Kronstadt served on the Debtors' board of directors, was a significant stockholder and likely was privy to communications with Gordian and others relating to the proposed sale transaction.  He is now attempting to distance himself from the company in a thinly veiled attempt to show independence, acquire the company and obtain a release for himself and the Insider Bidder.   This is simply improper under the circumstances.  As such, the Committee respectfully submits that because the Insider Bidder is an insider of the Debtors the transaction requires rigorous scrutiny, and it fails such scrutiny.

75.     Furthermore, because the Debtors seek to sell substantially all of their assets through an incredibly expeditious process pursuant to Bankruptcy Code section 363 in a sale that was announced through the filings of these Chapter 11 Cases, and without any serious regard to the Committee's opportunity to consider it, the safeguards afforded by a plan process under the Bankruptcy Code are avoided.   That fact also requires that the transaction receive closer scrutiny than a typical sale of assets outside the ordinary course of business. *In Re President Casinos, Inc.*, 314 B. R. 784, 785 (Bankr. E. D. Mo. 2004) (stating that the sale of all, or substantially all, of the assets of a Chapter 11 estate in the absence of a confirmed plan, while not forbidden is subject to

close scrutiny by creditors and the court); *Mission Iowa Wind Co. v. Enron Corp.*, 291 B. R. 39, 43 (S. D. N. Y. 2003).

76.     A sale of assets outside the ordinary course of business under section 363 (b) of the Bankruptcy Code requires a valid business justification, a price that represents fair value, and  sales transaction negotiated and entered into  in good faith. *Abbotts Dairies,* 788 F. 2d at 149-50; *In re Montgomery Ward Holding Corp.*, 242 .B.R. 147 (D. Del. 1999). Strict scrutiny demonstrates that all three of these elements are missing in the instant case.

77.     There is no valid business justification for this sale. Indeed, at this early stage, it is not clear that a sale is in the best interest of creditors, as opposed to a liquidation and retention of the causes of action. There is a real question whether the Debtors can be sold as a going concern when they have not operated as one for years, have no viable business plan to do so, and may lose the licensed technology that is at the heart of their product. If the Debtors have no going concern value, it may not yield the best value to market them as going concerns. Nor is it clear, even if the Debtors should be sold as a going concern,  that this is the best possible sale; since, it seems clear that there was no robust sale process prior to the filing of the bankruptcy petition. Furthermore, there is no indication of an essential reason to rush the process to this extent. This is not a "melting ice cube" situation, and there is no real reason to believe that the value of the Debtors' assets is depreciating at all. What seems to be driving the tight deadlines in this case are the DIP Financing terms. Not surprising since the DIP Lender in this case is managed by Kronstadt himself.  This raises serious questions of fairness when pushing

for aggressive deadlines that will likely caused a less than efficient auction and price yield.

78.    It is impossible to determine at this early date whether the price represents fair value. Courts often use the price paid for assets at a competitive public auction to determine whether a purchase price constitutes fair value. *Abbotts Dairies*, 788 F. 2d at 149. Unfortunately that is not possible in this case, since, the Bid Procedures and proposed DIP Financing chill any alternatives to Kronstadt, and Kronstadt's price appears to be plucked out of thin air.

79.    Kronstadt is not spending any real money, so he can choose to say that the sale price is as much or as little as of his purported lien as he wants. We do know two things about the purchase price.  First, the Committee believes that even if Kronstadt has a valid lien, the value of his collateral has not been determined. Given that his co-investors gave up their secured position indicating they thought the collateral was worthless, one might wonder why Kronstadt is bidding $3.2 million and whether he has a secured claim for that amount. In any event, Kronstadt cannot rig the bidding procedures so that no one else participates, provide the only bid of $3.2 million of credit, and then say that the price was fair because the public auction determined that $3.2 million was the correct price. Under strict scrutiny, this rationale does not hold up.  Second, we know that the proposed sale price provides no benefit whatsoever to the creditors. Again, under strict scrutiny, it is hard to justify a sale at this early stage on such a rapid timetable that provides absolutely no benefit to the estate and its creditors.

80.    Finally, while at this early stage the Committee is not prepared to say there was a lack of good faith, the Committee can certainly point to several indicia of a lack of

8241649/

good faith.  Just the fact that the Debtors and Kronstadt refused to negotiate a reasonable timetable and are trying to push this sale through over the objection of the Committee on a highly expeditious timetable over the holidays, without showing any benefit to the Debtors' estates, but rather only benefits and an insider whose right to credit bid is dubious at best creates a concern about good faith.

81.    The Debtors' attempt to justify this approach by giving great detail of its robust sale process when their own investment banker denies that there was a robust sale process is also a concern. (*See* Gordian Objection, Docket No. 63).   The Committee has tried to work with the Debtors to obtain discovery from Gordian to evaluate the sale process. The Debtors have blocked the committee at every turn and made it clear that the committee would incur an expensive fight over a protective order if  it tries to take discovery from the investment banker, even though, the  Debtors themselves are the ones who put the investment banker's conduct of the sale at issue. Furthermore, when the committee first tried to take discovery from the investment banker, Kronstadt tried to "buy off" Gordian by offering them a position as his own investment banker. See Gordian Objection at ¶6. The Debtors' failure to provide full transparency coupled with Kronstadt's behavior concerning the investment bankers raises an issue about good faith.

82.    Similarly, the overly broad releases and waivers that are incorporated as part of both the DIP financing and the bidding procedures make these transactions even more suspicious.  The Court should not allow for the orders to be entered incorporating broad releases, exculpations and indemnities without ample time and resources allocated to the Committee to investigate the pre-prepetition transactions. The Committee has a further concern that the releases are drawn so broadly that, intentionally or

8241649/

unintentionally, they may release the directors and officers against whom the Committee believes there may be viable causes of action.

83.    Another cause for suspicion is that under the DIP Financing, the Debtors are required to use $350,000 of the $850,000 borrowing limit to pay back a prepetition debt amount that was supposedly an advance from the DIP lender to fund payroll. (Transcript from December 4, 2015, hearing, at p. 21). As of this date, no loan documentation has been provided to substantiate the fact that the supposed advance was anything more than an infusion of equity to keep the business running.  By requiring the Debtors to pay back this unsecured advance on day one, the DIP lender, with the collusion of Kronstadt, transformed his unsecured advance into a secured loan at the expense of all creditors.

84.    Even if documentation does exist and is provided which purports to prove that the advance was secured, such advances are not necessarily to be considered loans, let alone secured loans. Under the doctrine of equitable recharacterization, other factors such as the existence of an arm's length transaction (clearly not present here) and intent of the advance are just as important in determining the status of an advance. *See, Bayer Corp. v. Massotech, Inc., (In re AutoStyle Plastics, Inc.),* 269 F.3rd 726 (6th Cir. 2001); *Fairchild Dornier GmbH v. Official Committee of Unsecured Creditors (in re Official Comm. Of Unsecured Creditors for Dornier Aviation (N. Am.), Inc.,* 453 F. 3rd 225 (4th Cir.2006); *Official Comm. Of Unsecured Creditors of Radnor Holdings Corp. v. Tennenbaum Capital Partners, LLC (in re Radnor Holdings Corp.)* 353 B.R. 820 (Bankr. D. Del. 2006).

8241649/

85.    One of the biggest concerns about good faith in this transaction is the fact that all of the papers have been deliberately vague about who the Stalking Horse Bidder is and who holds the  purported liens against the debtors. We have seen references to Kronstedt, Kronstadt affiliates and Kronstadt designees. What seems obvious is that the stalking horse buyer under the Insider APA cannot have been the holder historically of the Kronstadt liens, as it appears to be an entity formed for the sole purpose of serving as the stalking horse bidder. This implies that there had to be some collusion among various Kronstadt affiliates in order to get the lien into the hands of the bidder for the sole purpose of permitting the bidder to credit bid and have an advantage over other bidders. This raises serious questions whether the good faith finding under section 363 (m) can be provided in this case.

86.    Clearly, the committee should have more time to investigate the good faith in this transaction, and no 363 (m) finding should be entered at this time. But even without further investigation, it is clear that this transaction fails the strict scrutiny required of an insider  363 sale of all the assets outside of the ordinary course. With no real business justification, no indication of a fair purchase price and concerns about good faith, these transactions simply cannot be approved by this Court.

C.    The Sale and Bidding Procedures Coupled with the DIP Financing create an Impermissible *Sub Rosa* Plan

87.    The Sale and Bidding Procedures coupled with the DIP Financing create an impermissible *sub rosa* plan, which is itself sufficient reason to deny the Sale Motion.

88.    A transaction is an impermissible *sub rosa* plan if it disposes of all or substantially all of the debtor's assets without following the Bankruptcy Code's procedural protections in connection with the development and approval of a plan of

28

reorganization, such that the sale itself is a *de facto* plan. The procedural protections provided in the Bankruptcy Code include, among other things, the right to receive a detailed disclosure statement from a debtor and the right to vote on the proposed plan.

89.    Because of the importance of these protections to ensuring that creditors are treated fairly, courts have rejected proposed post-petition agreements between debtors and select creditors that have the effect of dictating material terms of a plan of reorganization or liquidation without complying with the Bankruptcy Code's procedural requirements for plan confirmation. *In re Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir. 1983) ("The debtor and the bankruptcy court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with a sale of assets"); *See also In re Decora Industries*, Case No. 00-4459-JJF, 2002 WL 32332749 at *8 (D. Del. May 20, 2002) ("the focus of 'sub rosa' plan analysis is oriented toward those situations in which a debtor proposes to sell 'all' or 'substantially all' of its assets without the benefit of a confirmed plan or a court-approved disclosure statement."); *In re Swallen's, Inc.*, 269 B.R. 634, 638 (BAP 6th Cir. 2001) ("At least when a party in interest objects, a bankruptcy court cannot issue orders that bypass the requirements of Chapter 11, such as disclosure statements, voting, and a confirmed plan, and proceed to a direct reorganization on the terms the court thinks best, no matter how expedient that might be.").

90.    It is also a fundamental policy of bankruptcy law that a debtor in possession has "an affirmative, overarching duty to reorganize and maximize estate assets for the benefit of all creditors," not just a select few. *In re R.H. Macy & Co.*, 170 B.R. 69,

8241649/

74 (Bankr. S.D.N.Y. 1994) (citing *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 527 (1984)).  Or, as in this case, just one.

91.    Where there is a proposed sale in Chapter 11 of substantially all of a debtor's property in exchange for retirement of secured debt, without the protections of the disclosure statement and plan process, as here, the transaction must be closely scrutinized and the transaction proponent bears a heightened burden. *See In re Channel One Communications, Inc.*, 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990) (citing *In re Industrial Valley Refrigeration & Air Conditioning Supplies*, Inc., 11 B.R. 15, 17 (Bankr. E.D. Pa. 1987)); see also *In re CGE Shattuck, LLC*, 254 B.R. 5, 12 (Bankr. D.N.H. 2000); *In re Wilde Horse Enterprises, Inc.*, 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991).  We have already demonstrated that this transaction cannot withstand heightened scrutiny.

92.    Section 363 asset sales should not be used to circumvent the protections for unsecured creditors mandated in the Bankruptcy Code. *In re Westpoint Stevens, Inc.,* 330 B.R. 30, 52 (S.D.N.Y. 2005) (stating that "it is well established that section 363(b) is not to be utilized as a means of avoiding Chapter 11's plan confirmation procedures", citing *In re The Babcock & Wilcox Co.,* 250 F.3d 955, 960 (5th Cir. 2001) ("[T]he provisions of § 363 ... do not allow a debtor to gut the bankruptcy estate before reorganization or to change the fundamental nature of the estate's assets in such a way that limits a future reorganization plan.")).  The U. S. Court of Appeals for the Third Circuit has said that 363 sales should not be used to short circuit the plan process and Sec. 1129 off the Bankruptcy Code. *Abbotts Dairies,* 788 F. 2d 143, *supra.* In *Abbotts Dairies,* the Court held that the good faith requirement of a 363 sale is to be used to assure that by means of a 363 asset sale, the debtor does not abrogate the protections

afforded under Sec. 1129 and the plan confirmation process. *Id.* At 150. Here, that is exactly what is happening. There is no reason the Debtors cannot propose a liquidating plan and accomplish their goals without abrogating creditors' protections.

93.     "[W]hen a pre-confirmation 363(b) sale is of all, or substantially all, of the Debtor's property, and is proposed during the beginning stages of the case, the sale transaction should be 'closely scrutinized, and the proponent bears a heightened burden of providing the elements necessary for authorization.'" *In re Whitehall Jewelers Holdings, Inc.*, 2008 WL 2951974, at *6 (Bankr. D. Del. July 28, 2008) (quoting *In re Summit Global Logistics, Inc.*, 2008 WL 819934, at *9 (Bankr. D.N.J. March 26, 2008)). The proposed sale in the present case does not stand such scrutiny.  When, as here,  a sales of essentially all of a debtor's assets includes future-looking provisions such as where proceeds are directed and what liabilities remain, such sale is essentially a  plan in disguise that circumvents protections the Bankruptcy Code has in place for such plans, and should not be approved. *In re Iridium Operating LLC*, 478 F.3d 452 (2d Cir. 2007); *Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir. 1983).

94.     While it is not the case that a sale of substantially all of a debtors assets should be approved only in emergencies, sales of a debtor's assets intended to predetermine any proposed reorganization plan should not be permitted. *See In re Lionel Corp.*, 722 F.2d 1063, 1069 (2d Cir. 1983).

95.     The proposed sales process, along with the DIP financing process, in the present case predetermines any reorganization plan that may be filed. The DIP financing and Bid Procedures as proposed by the Debtors essentially lets Kronstadt, for $500,000 in

31

cash, to emerge as both an owner and a creditor secured by all of the assets of the Debtors, while mishandling the liens of the State of Ohio and Community Bank and providing the unsecured creditors and equity with absolutely nothing. Perhaps the only reason the Debtors haven't proposed a plan is that it could not be confirmed since both the unsecured creditors and equity would be deemed to vote against the plan, and it is hardly fair and equitable to the dissenting creditors! *See* 11 U.S.C. §1129.

96.     The *Lionel* court lays out a general roadmap for assessing sales of a debtor's assets: "In fashioning its findings, a bankruptcy judge must not blindly follow the hue and cry of the most vocal special interest groups; rather, he should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike. He might, for example, look to such relevant factors as the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value. This list is not intended to be exclusive, but merely to provide guidance to the bankruptcy judge." *In re Lionel Corp.,* 722 F.2d at 1071. Here, the Debtors proposed to sell all the assets, on the first day, at a time when the assets are not decreasing in value, in a manner that prevents a plan, because the Debtors are immediately cut off from funding.

97.     The Debtors' estates would require cash in order to fund a budget to ensure that a Chapter 11 plan could be finalized, confirmed and implemented. To that

end, the successful bid should be required, as part of the purchase price, to provide an adequate amount of cash to fund a wind down budget as agreed upon by the Debtors and the Committee for the administration of the Debtors' remaining assets (which we hoped would include causes of action) and the wind-down of the Debtors' estates (the "Wind-Down Budget").

98.     The stalking-horse bid does not provide a Wind-Down Budget and the purchase price, which does not provide cash to the estates,  will not be sufficient to satisfy all of the costs necessary to wind-down the Chapter 11 proceeding.

D.     The Court Should Not Approve the Insider Bidder as a Stalking Horse Under the Proposed Bid Procedures and Insider APA

99.     The Court should not anoint the Insider Bidder as a stalking horse bidder under the structure proposed by the Bid Procedures and terms of the Insider APA.  The selection of a stalking horse bidder – and granting it special rights and protections – is justified only when the stalking horse bidder sets the floor for other bidders and the stalking horse bid is beneficial to the estate and is intended to maximize value of the debtors' assets.

100.     Approval of the Insider Bidder as the stalking horse bidder under the terms and conditions of the proposed Bid Procedures and Insider APA at this juncture provides no benefit to the estate:

101.     First, there is scant evidence to show that the Debtors, prior to the Petition Date and prior to their selection of the Insider Bidder as their stalking-horse bidder, adequately shopped the assets for sale.  The Committee needs time to explore the transaction and whether alternative proposals are superior to the Insider APA.

102.    Second, the Debtors have failed to justify to the Committee, the nature and proper security of the alleged credit bid.    Scant evidence has been provided that the Insider Bidder has a valid security interest on the Debtors' assets. Nor has  the Debtors or the Stalking Horse made any showing of the value of the stalking horse's purported collateral, so that, the Committee has an idea how much of Kronstadt's purported lien is a secured claim. The amount he proposes to bid which is somewhat vague (the proposed Insider APA does not require him to bid a minimum amount)and  does not appear to have any relationship to the value of the collateral or the value of the assets being purchased. It appears to be a made up number to ensure that the insider gets the assets but still has large enough liens against the assets to block anyone else from getting anything.

103.    Third, the Committee needs to investigate the Insider Bidder's and Kronstadt's extensive relationship with the Debtors, their non-debtor affiliates, and other parties-in-interest.  Permitting the Insider Bidder to credit bid could severely limit the Committee's rights and remedies and unfairly place Kronstadt in a superior position.

104.    Finally, the Committee has not yet been made privy to the stalking horse bidder's negotiations with the Debtors and has not concluded whether the benefits of the proposed bid are not outweighed by problems with the proposed Bid Procedures and the lack of unsecured creditor recovery proposed by the Insider APA.

105.    Under the sought to be established Bid Procedures, selection of the Insider Bidder as the stalking horse serves no valid purpose and does not further the goal of maximizing the estate nor providing meaningful Committee participation in these Chapter 11 Cases.

8241649/

E.    Inadequate Marketing Timeline and Process

106.    The deadlines associated with the sale, and hence the deadlines associated with the DIP Financing, must also be extended by at least sixty (60) days to ensure that all parties-in-interest have a fair opportunity to perform due diligence and submit a bid. *In re Energy Future Holdings Corp.*, (Bankr. D. Del. Nov, 4 2014) (Case No. 14-10979) (CSS) Tr. at 20:16-20 (holding that "… the proposed timelines must be stretched …to allow for sufficient time for any interest party to develop an alternative transaction … and the committee to … get up to speed."). It is alleged that the debtors did not conduct a "fulsome" sale process and Gordian was prohibited from contacting potential strategic buyers of the company. 12-4-2015 Tr., p. 23.    There is no indication that the Debtors have approved any strategic buyers to truly shop the company. Finally, based on the financial constraints placed by Kronstadt, it is apparent that the Debtors are unable to properly market their assets for sale or consideration of alternative solutions to their apparent liquidity constraints. *See In re Fisker Automotive Holdings, Inc.*, 510 B.R. 55, 60 (Bankr. D. Del. 2014) ("Hybrid if unchecked of its purchase, might well have frozen out other suitors for Fisker's assets.").

107.    Through its motion, the Debtors propose an expedited sale process to wit: the Debtors request a bid deadline of January 15, 2016, an auction of January 18, 2016, and a sale hearing on January 19, 2016. These deadlines are unreasonably short. There is a lack of (i) any adequate prepetition marketing, (ii) a business plan, go forward projections, information memorandum or management presentations, which are critical components of any bidder's due diligence and analysis, and (iii) any analysis of the Debtors' business segments as stand-alone businesses. (Nor is there any provision which

permits bids on the two business segments as standalone entities, which is also objectionable to the Committee.)

108.    There is uncertainty around the scope and validity of prepetition liens asserted by Kronstadt, which is being asserted as the basis for a credit bid.  The sale deadlines are strategically imposed on the Debtors by Kronstadt, whose interests may be contrary to the interests of the Debtors and their creditors. They are justified by the timeline in the DIP Financing which expires January 19, but these were dictated by Kronstadt, as well.

109.    This court has ordered that the Committee has until February 1, 2016, to investigate Kronstadt's alleged liens. It makes no sense whatsoever to allow a sale process encompassing the credit bid to go forward until the Committee's investigation s over. A potential bidder needs to know whether he has to provide a higher and better bid than a credit bid or a cash bid. Plus the estate could be using its limited resources to document a sale that cannot close because it is determined after the fact that Kronstadt should not have been allowed to credit bid. Worse yet for the long-suffering creditors who stand to receive nothing from this sale, would be if the sale occurring prior to the end of the investigation period moots some of the creditors rights and remedies if Kronstadt's liens are not as they are purported to be.

110.    Creating a false emergency is not a reason for approval of an expedited sale process.  Creditors are not proposed to receive any recoveries resulting from the sale. The estates may already be administratively insolvent and there are no assurances that anything will change after the sale.  It appears that Kronstadt has attempted to turn his equity into debt shortly prior to the bankruptcy filing and is now exercising undue control

over the Debtors. He may have pressed the Debtors into an expedited sale process in an attempt to create a "classic loan to own" scenario. The Court should limit Kronstadt's control over the sale process by extending the various sale related deadlines and leveling the playing field for other parties to compete.

E.    Cause Exists To Deny Kronstadt's Credit Bid And Require Only Cash Bids

111.    In connection with a sale under Bankruptcy Code section 363(b), the holder of a secured claim may, under certain circumstances, credit bid its secured claim. 11 U.S.C. § 363(k). The secured claim holder's ability to credit bid is not an absolute, unfettered right. *See e.g., In re Fisker Automotive Holdings Inc.*, 510 B.R. 55, 60-61 (Bankr. D. Del. 2014); *In re Daufuski Island Properties, LLC*, 441 B.R. 60, 64 (Bankr. D. S.C. 2010)(refusing credit bid where claim is disputed); In re Free Lance-Star Publ'g Co., 512 B.R. 798, 806 (Bankr. E.D. Va. 2014)(denying right to credit bid where lender purchased its debt prepetition and "pressed the Debtor 'to walk hand in hand' with it through an expedited bankruptcy sale process" in a "classic loan-to-own scenario").

112.    The Insider Bidder finds itself in a troubling position in these Chapter 11 Cases. Shortly before the bankruptcy, Kronstadt sought to cleanse himself from his deep involvement in the Debtors by resigning from the board of directors and selling his personal stock then proceeded to use his position to negotiate unfair Bidding Procedures and DIP Financing that leave nothing for any other creditor of the estates except a bagatelle to the State of Ohio and Community Bank. While the Committee was appointed a mere few days ago and discovery may reveal further facts warranting the relief sought, these facts alone provide sufficient cause required under section 363(k) of the Bankruptcy Code.

8241649/

113.    Kronstadt's liens and claims have not held up to scrutiny so far; thus, the exercise of the Court's discretion under section 363(k) of the Bankruptcy Code to deny the credit bid is appropriate. Among other things, (i) Kronstadt's pre-petition machinations to emerge as a secured creditor suggest inequitable conduct; (ii) Kronstadt does not hold the first lien on a significant part of the tangible assets, and it is unclear how he can bid in a second lien to buy the collateral, thereby depriving the first lien holder of its collateral; (iii) no effort has been made to  establish a value for either. Kronstadt's collateral as of the petition date or the value of the Debtors as a going concern;[17] (iv) it does not appear that the holder of the liens and the Insider Bidder are one in the same; (v) Kronstadt has used his insider status and control of the DIP Lender to gain an unfair advantage over all other potential buyers; and finally (vi). Kronstadt's misuse of his insider status may provide grounds to equitably subordinate or recharacterize his claims.

114.    The Committee is in the process of investigating  Kronstadt's alleged liens and security interests and the pre-petition sale process and until such time as the Committee is satisfied with, or if Kronstadt establishes the validity of his liens and security interests, the privilege of a credit bid should not be afforded.  The challenge period runs past the proposed sale hearing.  Affording the Insider Bidder the right to credit bid prior to the expiration of the challenge period frustrates the statutory charge provided to the Committee to investigate prepetition conduct and the important task of avoidance actions.  See 11 U.S.C. §1103(c)(2), (5); *see also Official Comm. ex. rei. Cybergentics v. Chinery*, 330 F.3d 548, 579-80 (3d Cir. 2003)("Because it helps to ensure

---

[17] Indeed, even had Debtors been vigorously marketed, which we don't believe to be the case, it would not establish a value for the Debtors, because, when they were marketed, The debtors had tens of millions of dollars on their balance sheets which has since been forgiven.

that creditors' claims are not frustrated by fraudulent transfers, derivative standing seems clearly to 'give effect to the policy of legislature.'").

115.    Section 363(k) of the Bankruptcy Code expressly grants the court discretion to deny a creditor's ability to credit bid "for cause." Although cause is not defined within section 363, cause is a "flexible concept enabling a court to fashion an appropriate remedy on a case-by-case basis." *In re NJ Affordable Homes Corp.*, Case No. 05-60442-DHS, 2006 WL 2128624 at *16 -18- 559472.1 6/6/08 (Bankr. D.N.J. June 29, 2006). The language of section 363(k) permits the Court to specifically restrict the ability to credit bid. *Id.* 59.

116.    Further a credit bid, without a cash component, fails to provide the liquidity needed to fund distributions under a confirmable and feasible Chapter 11 plan. The Insider Bidder should not be permitted to credit bid unless that bid includes a cash component sufficient (a) to satisfy all Chapter 11 administrative expenses and priority claims as part of a Chapter 11 plan, (b) to provide sufficient funding for the plan process and the expenses that will accrue during the post confirmation wind-down period, and (c) to provide for a recovery for unsecured creditors sufficient to fund a distribution under a confirmable and feasible Chapter 11 plan.

117.    Even if the Insider Bidder is allowed to credit bid in this case, the Sale Order must make clear that their alleged liens and security interests are not *ipso facto* found valid by the entry of the Sale Order. According to *In re Radnor Holdings Corp.*, 353 B.R. at 820 unless this Court expressly reserves the Committee's rights, the entry of an order permitting a credit bid is tantamount to an order approving the nature, extent and validity of the lien claim and also prevents any litigation against the lender for avoidance,

reduction, recharacterization, disallowance, disgorgement, counterclaim, surcharge, subordination, marshalling or other litigation claims. Thus, the Committee requests that if the Bank Group is allowed to credit bid, the Sale Order include the following language: "The failure of the Committee to object to a bid put forth by the Prepetition Lenders or the DIP Lenders shall not (a) prejudice or impair the rights of the Official Committee of Unsecured Creditors (the "Committee") to challenge the nature, extent, validity, priority, perfection or amount of the Prepetition Lenders' and/or the DIP Lenders' alleged liens, security interests and claims or (b) release the Prepetition Lenders or the DIP Lenders from any causes of action which can be brought by or on behalf of the Debtors' estates relating to any of the foregoing.

F.    The Breakup Fee and Other Bidding Procedures Will Chill Bidding and Should Not Be Allowed

118.    Debtors' Bidding Procedures Motion cites various judicial standards for approving sales procedures, but does little to show how these standards are met. Most glaringly, Debtor cites the *O'Brien* case, *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999), for its articulation of standards for approving incentives for a stalking horse purchaser. Bid Procedures Motion, pp. 33-35. The Motion correctly cited *O'Brien* as stating that incentives are not merely subject to a business judgment standard, but that they must meet the 11 U.S.C. § 503(b) standard for administrative expenses, or must be necessary to preserve the estate. *Id.* at 533. In the context of break-up fees, this can be met if the break-up fee promotes more competitive bidding or if the availability of the incentive induced the stalking horse to research the value of the debtor and submit a bid. In the present case, there is no indication whatsoever that more competitive bidding was induced because of the

40

incentives. In fact, the opposite is true in this case – bidding is chilled due to the unreasonable break-up fee and expense reimbursements. The stalking horse in the instant case is Kronstadt. He was an active member of the Debtors' pre-petition board of directors until mere months prior to the Petition Date. He was also an active investor in the Debtors and a controlling shareholder. Few people know the Debtors as well as Kronstadt. There is no reason to believe that an overly generous incentive such as the one proposed in Debtor's motion was necessary in order to induce Kronstadt to inspect the Debtor, if such inspection was at all necessary.

119.    The Motion proceeds to list nine factors the *O'Brien* court viewed as relevant in assessing the validity of break-up fees and expense reimbursement: (1) the presence of self-dealing or manipulation in negotiating the break-up fee and expense reimbursement; (2) whether the fee harms, rather than encourages, bidding; (3) the reasonableness of the break-up fee and expense reimbursement relative to the purchase price; (4) whether the "unsuccessful bidder place[d] the estate property in a sales configuration mode to attract other bidders to the auction"; (5) the ability of the request for a break-up fee and expense reimbursement "to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders"; (6) the correlation of the fee to a maximization of value of the debtor's estate; (7) the support of the principal secured creditors and other official committees; (8) the benefits of the safeguards to the debtor's estate; and (9) the "substantial adverse impact on unsecured creditors, where such creditors are in opposition to the break-up fee." Bid Procedures Motion, p. 33 (citing *O'Brien*, at 536).

120.    The Debtor then proceeds to give a cursory overview of the incentives proposed in the current case and concludes that the *O'Brien* factors are met. A more thorough review, though, shows that the factors are not met at all. Contrary to what is presented by the Debtors, the negotiation between Kronstadt and the Debtor was far from at arm's length. As recently as June, 2015, he was on Holdings' board of directors. As recently as October, 2015, Kronstadt was a 17.8-20.1% shareholder of Debtor's (approximately 12.5 million shares). Through a series of unclear transactions that occurred in November, 2015, somehow Kronstadt relinquished an unknown number of his shares, and now a foundation of his and a number of trusts for the benefit of his descendants hold approximately 225,000 shares of the Debtor. He also supposedly holds approximately $5.2 million in secured debt.

121.    The Insider APA would have Kronstadt credit bid $3.2 million of his alleged secured debt. The only cash amount he would put up is $500,000 after he prevails (which under these bid procedures he most certainly would) that would go towards acquiring the collateral for the Ohio Debt and the Community Debt, which amount is insufficient to wipe out their first liens. He would not be required to deposit any money up front or otherwise provide assurances of his commitment or even supply financial information to indicate the feasibility of this bid or his adequate assurances to parties to assumed contracts. This is in contrast to other potential bidders who would be required to jump through many hoops just in order to qualify to begin due diligence and have their bids considered. Among other requirements, potential bidders would need to provide audited financial statements and to deposit 10% of their bid amount in cash. The proposed minimum bid would need to offer a purchase price of at least $150,000 more

8241649/

than Kronstadt's bid plus his outrageously high proposed break up fee of $550,000 and expense reimbursement of $250,000. These amounts are exorbitant and can serve no purpose but to chill bidding. These procedures should not be permitted. To be clear, to enter a bid, a competing bidder must be prepared to make an initial bid more than 25% higher than Kronstadt's bid, *in cash*. And as soon as he does, Kronstadt can jump in and top it with his play money. Hardly an incentive to bid.

122. The DIP also works to chill other bids. For example, the DIP loan terminates if the Insider Bidder does not prevail. A successful bidder has not even a day to get new financing in place, putting him at a considerable disadvantage. The Insider Bidder should not be able to wield the DIP Financing like a sword over competing bidders' heads. Returning to the factors listed by the Third Circuit in the *O'Brien* case, (1) the entire proposed deal is by no means an arm's length transaction, and particularly the negotiation of the break-up fee was not such; (2) the fee will most definitely chill, rather than encourage, bidding, as it is an extremely high percentage increase to any potential bid; (3) the $550,000 break-up fee, plus up to $250,000 in expenses is $800,000, which is close to 22% of Kronstadt's bid; (4) there is no indication that the stalking horse placed the estate property in a sales configuration mode, but rather quite to the contrary, indicators show that these procedures and the complementary DIP Financing were designed to discourage potential bidders other than Kronstadt; (5) similarly, there is little to indicate that the promise of a break-up fee and expense reimbursement is what attracted the initial bid, especially considering Kronstadt's prior knowledge of and involvement in the Debtor company. The Debtors' seeming willingness to let him buy the Companies almost for free was presumably a much bigger incentive; (6) there seems to

43

be no correlation between the fee and the maximization of the estate; (7) neither the Community, which holds the first lien, nor the Committee supports the sale procedures, and most particularly the expense reimbursement and breakup fee; (8) there do not seem to be any meaningful safeguards added to the estate because of the proposed fee; and (9) as described above, these fees indeed do have a substantial adverse impact on unsecured creditors, and on the estate more generally. These fees fail the very *O'Brien* test that the Debtor raises in its Motion for Sale Procedures Authorization.

123.    Break-up fees are to be strictly scrutinized. As a general rule, combined break-up fees and reimbursement do not exceed three or four percent of the initial bid. *See, e.g., In re Integrated Resources, Inc.,* 147 B.R. 650, 654 (S.D.N.Y. 1992) (finding 3.3% to be in accord with industry averages); *In re Biedermann Indus., U.S.A., Inc.,* 203 B.R. 547, 553 (Bankr. S.D.N.Y. 1997) (finding 4.4%-6% being "certainly on the high side," and after excluding from the calculation the monies generated from the debtor's own assets). In the present case, Kronstadt is demanding a total of $800,000 in break-up fees and expense reimbursement, while his bid is for a total of $500,000 in cash and another $3.2 million in a secured credit bid. This is a whopping 21.6% of his initial bid, *or more than five times the industry standard.*

124.    That is without taking into consideration that Kronstadt was familiar with the company already, and that one of the central reasons for allowing break-up fees, namely to encourage an initial bidder to investigate and bid on the company, essentially does not exist in the instant case. Furthermore, Kronstadt is an insider and has *no cash at risk.* He has not made a deposit here, preventing him from pursuing other opportunities. He only has to come up with his $500,000 if and when he prevails. Nonetheless, he is

44

demanding break up fees and expense reimbursements that aggregate well in excess of the cash he has to put into the deal. Such greed should not be condoned by this Court. Debtors have failed to justify the need for a break-up fee and expense reimbursement. No breakup fee or expense reimbursement should be allowed here.

G,    The Terms of the DIP Loan are Unfair and Inappropriate

125.    There has been no analysis provided as to whether the Debtors can support the debt structured by the DIP Lender. The proposed financing arrangement anticipates a due date of January 19, 2016, in line with the proposed closing of the Insider APA. By and through the DIP Facility, the Debtors seek to lock the Committee into a sale process that benefits insiders alone, and the DIP Facility will expire should a closing not be made timely.

126.    The Debtors, Kronstadt, and the DIP Lender seek to limit the Committee's scrutiny on these matters. A mere $25,000 is allotted to the Committee for investigation purposes. Again, it is obvious that the Committee needs to spend significant time analyzing the transactions and there should be no limit on the Committee's investigation as to the assets of the Debtors and whether there are assets that are not secured. The Committee objects to the DIP Lender's status as a pre-petition secured creditor and such an entity should have no legal ability to restrict the use of the Debtors' funds to pay administrative expenses claims such as the Committee's fees and expenses.

127.    The Committee understands that DIP lenders will not provide an unlimited war chest of DIP financing proceeds to attack that DIP lender's pre-petition collateral. Given the suspicious conduct and Kronstadt's attempt to use his insider status to chill bidding and take the assets almost for free at the expense of unsecured creditors,    the

8241649/

Committee believes that an amount of $150,000 should be provided to the Committee to investigate. The Committee's period to investigate challenges should be extended to 90 days.

H.    The DIP Lender Should Not Have A Lien On Proceeds of Avoidance Actions

128.    The Debtors should not be allowed to grant the DIP Lender a lien on avoidance actions and the proceeds thereof over the objection of unsecured creditors because a debtor's avoidance powers are evoked only for the benefit of creditors. *See Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 244 (3d Cir. 2000) (noting that the underlying intent of avoidance powers is recovery of valuable assets for the benefit of a debtor's estate); *Bethlehem Steel Corp. v. Moran Towing Corp. (In re Bethlehem Steel Corp.)*, 390 B.R. 784, 786-87 (Bankr. S.D.N.Y. 2008) ("Avoidance actions . . . never belonged to the Debtor, but rather were creditor claims that could only be brought by a trustee or debtor in possession.").

129.    There is no legal basis for the DIP Lender to evoke a right to the proceeds of any chapter 5 causes of action. Indeed, courts have recognized that "empowering the trustee or the debtor in possession to avoid a transaction by pursuing an individual creditor's cause of action is a method of forcing that creditor to share its valuable right with other creditors." *In re Cybergenics Corp.*, at 244. Restricting the Debtors' ability to pledge the proceeds of any avoidance actions is especially appropriate here where the pre-petition obligations of the DIP Lender, the transactions involving Kronstadt and other insiders may ultimately be the subject of avoidance or other causes of actions.

8241649/

130.    Similarly, while it is often appropriate to give a prepetition lender adequate protection by providing a lien on the chapter 5 causes of action, it is inappropriate in this case because the prepetition lender and the postpetition lender are one in the same. Through the proposed credit bid and the lack of any valuation of Debtors, Kronstadt has the ability to characterize how much of his alleged lien remains as prepetition, and how much is postpetition. By picking numbers out of thin air as an appropriate credit bid amount, Kronstadt can be sure that he keeps sufficient prepetition debt on the debtor to cover all of the avoidance actions and prevent them from being available to the estate. Therefore, by giving the pre-petition lender (*i.e.,* Kronstadt) a lien on the chapter 5 causes of action as adequate assurance for his prepetition liens, one defeats the purpose of not giving a postpetition lender the chapter 5 avoidance actions.

131.    Similarly, Kronstadt controls what the Insider Bidder is buying from the debtors. Although Kronstadt does not need general causes of action to run the business of the debtors, he nonetheless insists on buying them. This protects his cronies who have enabled him to buy the company for little to no consideration, while depriving the creditors of potentially valuable causes of action against directors, officers, managers, agents, etc. Of course, Kronstadt compounds this by purporting to give releases to the same people. There should be no lien on avoidance actions, no sale of general causes of action, and no releases to anyone other than the DIP Lender.

I.    Adequate Assurance

132.    The adequate assurance provisions in the sale procedures are wholly inadequate. Basically, creditors who are parties to contracts to be assumed are told to trust that the Insider Bidder is well financed. This is not an adequate assurance of future

47

performance.    Furthermore, the debtors insist on having the sale hearing the morning after the auction. If the bid procedures can be normalized to provide a fair process, it is possible that Kronstadt is not the prevailing bidder. This timetable prevents creditors who are parties to assumed contracts from having the time to negotiate properly for adequate assurance with the prevailing bidder.    Finally, at least one party to a contract, Rutgers University, has claimed that the debtors' monetary and nonmonetary defaults may not be capable of cure, and the contract cannot be assumed. This contract is vital to the debtors going concern value. It is difficult to see how the sale can go forward unless this matter is resolved.

### **Reservation of Rights**

133.    The Committee reserves the right to supplement its Objection at any time prior to any hearing relating to the Objection.    The Committee expressly reserves its rights to raise additional or further objections to any sale, including without limitation the Insider Bidder, the Insider APA, or proposed Bid Procedures at or prior to the hearing or at any subsequent hearing.

8241649/

## Conclusion

For the foregoing reasons, the Committee respectfully requests that the Court deny the relief sought by the Debtors.

Respectfully submitted,

Date:  December 23, 2015     **MORRIS JAMES LLP**

_____

Eric J. Monzo (DE Bar No. 5214)
Douglas N. Candeub (DE Bar No. 4211)
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE  19899-2306
Telephone:  (302) 888-6800
Facsimile:  (302) 571-1750
Email: emonzo@morrisjames.com
Email: dcandeub@morrisjames.com

-and-

Sandra E. Mayerson, Esquire
LAW OFFICES OF SANDRA MAYERSON
136 E. 64th Street
Suite 11E
New York, NY  10065
Telephone:  (917) 446-6884
Facsimile:  (212) 750-1906
Email: sandy@sandymayersonlaw.com

Proposed Counsel for the Official Committee of
Unsecured Creditors

8241649/